[No. D004619. Fourth Dist., Div. One. July 9, 1987.]

CRISTIAN TOSCANO LOPEZ, a Minor, etc., et al., Plaintiffs and Appellants, v.
McDONALD'S CORPORATION, et al., Defendants and Respondents.

■■■■■■■■■■■■

■■■■■■■■■■■■

## COUNSEL

McAvoy & Korrey, David M. Korrey, Sugarman & Csillag, Arthur Csillag and Ronald Sugarman for Plaintiffs and Appellants.

Hollywood & Neil, Gina Lacagnina, Horvitz, Levy & Amerian, Barry R. Levy and Peter Abrahams for Defendants and Respondents.

## OPINION

WORK, J.—Survivors and surviving family members of victims of the tragic 1984 massacre at McDonald's restaurant in San Ysidro, California, appeal a summary judgment in favor of McDonald's Corporation, and its franchisee, Bosherro 522 Partnership and Robert T. Colvin (McDonald's). They challenge a trial court determination that as a matter of law McDonald's had no duty to provide protection against mass murderous assaults. For the reasons which follow, we conclude such an event constitutes a hazard outside the boundaries of a restaurant's general duty to protect its patrons from reasonably foreseeable criminal acts of third parties. Further, assuming this event were a hazard within the scope of McDonald's protective duty, we conclude there exists no causal nexus between the proprietor's breach of duty to protect its patrons from reasonably foreseeable criminal acts of third parties and the injuries suffered by plaintiffs here. Accordingly, we affirm the judgment.

### I

### FACTUAL AND PROCEDURAL BACKGROUND

On a clear and sunny day, James Oliver Huberty entered McDonald's restaurant in San Ysidro dressed in camouflage pants and armed with a 9 mm. semiautomatic rifle, a semiautomatic 9 mm. pistol and a .12 gauge shotgun. He immediately began indiscriminately·slaughtering patrons and employees within the glass-enclosed structure. During the hour of terror before he was killed by a police sharpshooter, Huberty showed no intent to

rob the restaurant; made no demands for money; made no effort to take hostages; loaded his weapons several times; and killed 21 people in the restaurant and wounded 11 others. His single apparent purpose was to kill as many people as possible before he himself was slain.

Plaintiffs sued for damages for wrongful death and personal injuries[1] on theories of negligence and premises liability, alleging McDonald's failed to provide adequate safety devices or security personnel to protect customers from dangerous and known risks. In support of their theory of liability, plaintiffs allege McDonald's knew its San Ysidro facility was in a high-crime area and its employees were so concerned over the criminal activity within the immediate vicinity they had solicited a private security company to offer its services to McDonald's. The security service's proposal to McDonald's management and ownership cited the area's high-crime rate, increasing gang activity and nearby incidents of violent crimes which would have endangered McDonald's patrons had they occurred on its premises. Claiming economic reasons, McDonald's declined the security service offer to provide a uniformed security officer at $5.75 an hour.

McDonald's motion for summary judgment contends this sudden and unprecedented mass slaying of customers within its restaurant was not foreseeable; imposing a duty to prevent such incidents is totally impracticable and contrary to public policy; and there is no causal connection between the alleged security inadequacies and the plaintiffs' injuries.

McDonald's filed a declaration of the assistant manager of its franchise and the San Diego Police Department lieutenant in charge of homicide to support its summary judgment motion. They established the undisputed facts of the incident. Further, the employee's declaration described Huberty's entry into the restaurant, his random shooting at everything and everyone in sight, the reloading of his automatic weapons and his walking up and down the aisles slaughtering all those he found still alive and that his only apparent motive was to randomly kill.[2] The lieutenant's declaration echoed the employee's declaration, adding an investigation revealed Huberty kissed his wife goodbye and stated he was going "hunting for humans"; his act appeared to be that of a "demented, mentally unbalanced man, bent on murder and self-destruction"; upon entry into the restaurant, he systematically and without warning shot and killed patrons and employees until he apparently believed all were dead; and by the time of his death, he still had

---

[1] This case involves two consolidated actions for wrongful death and personal injuries, including Lopez et al. v. McDonald's Corp. et al., San Diego Superior Court Case No. 541624 and de Toscano et al. v. McDonald's Corp. et al., San Diego County Superior Court Case No. 545266.

[2] The assistant manager further testified the interior of the restaurant was clearly visible to passersby and accessible by several entrances at the time Huberty entered the restaurant.

ample ammunition. To the officer's knowledge, there had never been an incident in San Diego involving such a deliberate, unprovoked random slaughter.

Plaintiffs presented evidence tending to show that between January 19, 1981 and July 18, 1984, the crimes committed on the restaurant premises included two robberies, two petty thefts, one unlawful use of vehicle, vandalism, grand theft and theft by fraud. During the same approximate time period, crime statistics revealed that within a one-tenth of a mile radius of the restaurant, six burglaries, five batteries, one assault with a deadly weapon, two drawings of a deadly weapon, numerous grand thefts and various other crimes were committed. During the same approximate time period within a two-tenths of a mile radius of the restaurant, five robberies, five batteries, three assaults with a deadly weapon, thirty-eight felony thefts, two drawing of deadly weapons and numerous other crimes against property, thefts and vandalism were committed. The FBI crime index for the fiscal year 1983-1984 shows the San Ysidro crime rate was higher than the city-wide crime rate in the following ratios: crimes generally were 125 percent; violent crimes were 228 percent; murder was 262.5 percent and rapes, etc. were 173.2 percent.

Plaintiffs also presented the deposition of Wilbert W. Holley, employed by Allegiance Security Incorporated for marketing, sales and surveys. Holley, who had been in the security field for approximately 10 years, attempted to sell security to the McDonald's restaurant just two months before the massacre. He obtained crime statistics for the San Ysidro area and told Mr. Sissung in the McDonald's corporate offices he had spoken to employees at the San Ysidro facility. He stated the restaurant was in a high-crime area and that in his professional opinion, as well as that of the employees he questioned, security was needed and uniformed, licensed security officers could be provided at $5.75 per hour. Sissung rejected the offer, declaring: "That's too much money. We don't want to spend any money. There is no problem, we don't need it anyways." Without citing any supporting *fact,* Holley opined, "The use of security at that site would have acted as a deterrent and could possibly have prevented the [massacre]." Additionally, he stated there was no visible security at McDonald's, but that the nearby Jack-in-the-Box employed uniformed, licensed security people. Finally, he declared on the basis of personal experience, the use of security devices or personnel reduce the incidents of crime and theft.[3]

Other evidence showed that at the time of the incident, one could not see into the restaurant because of the bright sunlight glaring on the tinted

---

[3] Holley further testified Huberty's wife stated her husband watched the McDonald's with his binoculars from the window of their apartment.

windows; the site of the restaurant was elevated above other buildings in the surrounding area; and there was substantial graffiti throughout the immediate area. A summary of security systems of approximately 24 neighboring businesses showed they ranged from armed guards (at foreign currency exchanges), closed circuit T.V.'s, alarm systems with and without mobile security response, to periodic roving security patrols.

## II

### STANDARD OF REVIEW

The underlying purpose for summary judgment is to resolve litigation by avoiding needless trials. (*Ferrell* v. *Southern Nevada Off-Road Enthusiasts, Ltd.* (1983) 147 Cal.App.3d 309, 313 [195 Cal.Rptr. 90]; see Code Civ. Proc., § 437c.) ■ A summary judgment may be granted only if no material triable issue of fact exists. The moving parties' affidavits must set forth facts entitling them to a judgment as a matter of law. (*Lipson* v. *Superior Court* (1982) 31 Cal.3d 362, 374 [182 Cal.Rptr. 629, 644 P.2d 822]; *Cohen* v. *Southland Corp.* (1984) 157 Cal.App.3d 130, 137 [203 Cal.Rptr. 572]; *Ferrell* v. *Southern Nevada Off-Road Enthusiasts, Ltd., supra,* 147 Cal.App.3d at p. 313.) Similarly, where there are no triable issues of fact and the parties' contentions involve an issue of law, summary judgment is proper. (*Ferrell* v. *Southern Nevada Off-Road Enthusiasts, Ltd., supra,* 147 Cal.App.3d at p. 313.)

■ " 'In examining the sufficiency of affidavits filed in connection with the motion, the affidavits of the moving party are strictly construed and those of his opponent liberally construed, and doubts as to the propriety of granting the motion should be resolved in favor of the party opposing the motion. Such summary procedure is drastic and should be used with caution so that it does not become a substitute for the open trial method of determining facts.' " (*Corwin* v. *Los Angeles Newspaper Service Bureau, Inc.* (1971) 4 Cal.3d 842, 851-852 [94 Cal.Rptr.785, 484 P.2d 953], quoting *Stationers Corp.* v. *Dun & Bradstreet, Inc.,* (1965) 62 Cal.2d 412, 417 [42 Cal.Rptr. 449, 398 P.2d 785]; *Twohig* v. *Briner* (1985) 168 Cal.App.3d 1102, 1105 [214 Cal.Rptr. 729].) The moving party has the burden to furnish supporting documents establishing the claims of the adverse party are entirely without merit on any legal theory. (*Lipson* v. *Superior Court, supra,* 31 Cal.3d at p. 374; *Cowen* v. *Southland Corp., supra,* 157 Cal.App.3d at p. 137.) ■ Finally, where the evidence in support of the summary judgment motion is lacking, the moving party cannot rely on unsupported pleading allegations to prove its case. (*Lipson* v. *Superior Court, supra,* 31 Cal.3d at p. 374.)

III

WHETHER LIABILITY SHOULD BE
PRECLUDED AS A MATTER OF LAW

█ Acknowledging its duty to protect against reasonably foreseeable harm, McDonald's argues Huberty's armed, deranged attack was not the type of harm that was reasonably foreseeable. Moreover, it asserts it would be unreasonable to impose a burden of protecting against the type of harm involved here.

Judicial treatment of the concept of "duty" within the negligence context has left a legacy of analytical confusion. (*Marois* v. *Royal Investigation & Patrol, Inc.* (1984) 162 Cal.App.3d 193, 197-199 [208 Cal.Rptr. 384]; *Hucko* v. *City of San Diego* (1986) 179 Cal.App.3d 520, 523 [224 Cal.Rptr. 552].) █ The special relationship between a business establishment and its customers as a matter of law places an affirmative "duty" on the proprietor to take reasonable precautions to protect patrons from *reasonably anticipative* criminal conduct of unknown third parties. (*Isaacs* v. *Huntington Memorial Hospital* (1985) 38 Cal.3d 112, 123 [211 Cal.Rptr.356, 695 P.2d 653]; *Taylor* v. *Centcnnial Bowl, Inc.* (1966) 65 Cal.2d 114, 121 [52 Cal.Rptr. 561, 416 P.2d 793]; *Gregorian* v. *National Convenience Stores, Inc.* (1985) 174 Cal.App.3d 944, 948-949 [220 Cal.Rptr. 302]; *Marois* v. *Royal Investigation & Patrol, Inc., supra,* 162 Cal.App.3d at p. 199; *Cohen* v. *Southland Corp., supra,* 157 Cal.App.3d at pp. 137-138.) █ Thus, the primary issue here is not whether a fast-food proprietor has a duty to protect plaintiffs from the potential criminal attacks perpetrated by unknown third parties, but rather to determine whether the boundaries of McDonald's general "duty" encompasses the burden to protect against once-in-a-lifetime massacres. We do this by evaluating this specific event's reasonable foreseeability, or likelihood of occurrence under the circumstances, with applicable policy considerations in resolving whether liability should be restricted. (See *Ballard* v. *Uribe* (1986) 41 Cal.3d 564, 572, fn. 6 [224 Cal.Rptr. 664, 715 P.2d 624].)

█ Analysis of liability for negligence within the context of "duty" has been criticized as a "question-begging process"; for, "duty" is not sacrosanct or an immutable fact of nature, but only a shorthand expression of the sum total of public policy considerations which lead the law to protect a particular plaintiff from harm. (*Ballard* v. *Uribe, supra,* 41 Cal.3d at p. 572, fn. 6; *Dillon* v. *Legg* (1968) 68 Cal.2d 728, 734 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316]; *J'Aire Corp.* v. *Gregory* (1979) 24 Cal.3d 799, 803 [157 Cal.Rptr. 407, 598 P.2d 60]; *Marois* v. *Royal Investigation & Patrol, Inc., supra,* 162 Cal.App.3d at p. 197; *Myers* v. *Quesenberry* (1983) 144

Cal.App.3d 888, 891 [193 Cal.Rptr. 733]; *Elam* v. *College Park Hospital* (1982) 132 Cal.App.3d 332, 338-339, fn. 7 [183 Cal.Rptr. 156].) In fact, the general rule in California is that all persons have a duty to employ ordinary care to prevent others from being injured as a result of their conduct. (*Ballard* v. *Uribe, supra,* 41 Cal.3d at p. 572, fn. 6; *Lipson* v. *Superior Court, supra* 31 Cal.3d at p. 372; *Rowland* v. *Christian* (1968) 69 Cal.2d 108, 112 [70 Cal.Rptr. 97, 443 P.2d 561].) Thus, any "duty" analysis begins "with the fundamental policy embodied in Civil Code section 1714, providing liability for injuries to another caused by one's failure to exercise ordinary care under the circumstances." (*Elam* v. *College Park Hospital, supra,* 132 Cal.App.3d at p. 339.) Liability for negligent conduct is, therefore, the rule. No exception is made unless clearly supported by public policy considerations. (*Lipson* v. *Superior Court, supra,* 31 Cal.3d at p. 372; *Rowland* v. *Christian, supra,* 69 Cal.2d at p. 112; *Elam* v. *College Park Hospital, supra,* 132 Cal.App.3d at p. 339.)

Where the court endeavors to determine the boundaries of "duty", the pertinent inquiry is whether public policy justifies departing from the general rule that persons will be held *liable* for failing to act reasonably. "The issue is one of legal remedy, not 'duty.' In cases where liability is restricted, society is not intending to foster unreasonable conduct; rather, other policy interests are seen as being adversely affected if defendants' conduct and decisions are subject to judicial scrutiny and sanctions. [Citation.]" (*Hucko* v. *City of San Diego, supra,* 179 Cal.App.3d at p. 523.) "Any departure from the fundamental principle involves the 'balancing of a number of considerations; the major ones are the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved. [Citations.]'" (*Becker* v. *IRM Corp.* (1985) 38 Cal.3d 454, 467 [213 Cal.Rptr. 213, 698 P.2d 116, 48 A.L.R.4th 601], quoting *Rowland* v. *Christian, supra,* 69 Cal.2d at pp. 112-113; *Ballard* v. *Uribe, supra,* 41 Cal.3d at p. 572, fn. 6.) Moreover, in determining whether "liability" can be imposed if negligence is proved, the courts are guided by "history, our continually refined concepts of morals and justice, the convenience of the rule, and social judgment as to where the loss should fall." (*Weirum* v. *RKO General, Inc.* (1975) 15 Cal.3d 40, 46 [123 Cal.Rptr. 468, 539 P.2d 36]; see *Elam* v. *College Park Hospital, supra,* 132 Cal.App.3d at p. 340, fn. 9.)

On the other hand, one will not be held liable for failing to control third-party conduct or to warn those who may be endangered by that

conduct, unless " '(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or (b) a special relation exists between the actor and the other which gives the other a right to protection.' " (*Peterson* v. *San Francisco Community College Dist.* (1984) 36 Cal.3d 799, 806 [205 Cal.Rptr. 842, 685 P.2d 1193], quoting Rest.2d Torts, § 315; *Davidson* v. *City of Westminster* (1982) 32 Cal.3d 197, 203 [185 Cal.Rptr. 252, 649 P.2d 894]; *Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425, 435 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166]; *Marois* v. *Royal Investigation and Patrol, Inc., supra,* 162 Cal.App.3d at p. 199.) ■ The relationship between a business establishment and its customers requires the proprietor protect its patrons from third person misconduct on the business premises when there is reasonable cause to anticipate such acts and resulting harm. (*Isaacs* v. *Huntington Memorial Hospital, supra,* 38 Cal.3d at pp. 123-124; *Taylor* v. *Centennial Bowl, Inc., supra,* 65 Cal.2d at p. 121; *Gregorian* v. *National Convenience Stores, Inc., supra,* 174 Cal.App.3d at pp. 948-949; *Cohen* v. *Southland Corp., supra,* 157 Cal.App.3d at pp. 137-138.)[4]

■ "The question of 'duty' is decided by the court, not the jury. [Citations.]" (*Ballard* v. *Uribe, supra,* 41 Cal.3d at p. 572, fn. 6.) The *Rowland* analysis of landowner liability directs the court to weigh the foreseeability of harm with a nonexhaustive list of other factors and policy considerations in determining whether liability should be restricted within the factual context of a specific case. (*Isaacs* v. *Huntington Memorial Hospital, supra,* 38 Cal.3d at pp. 123-129; see e.g., *Thompson* v. *County of Alameda* (1980) 27 Cal.3d 741, 750-758 [167 Cal.Rptr.70, 614 P.2d 728, 12 A.L.R.4th 701];

---

[4] "It has long been recognized that 'a possessor of land who holds it open to the public for entry for business purposes is subject to liability to members of the public while they are upon the land for such a purpose, for physical harm caused by the accidental, negligent or intentionally harmful acts of third persons . . . and by the failure of the possessor to exercise reasonable care to (a) discover that such acts are being done or are likely to be done, or (b) give a warning adequate to enable the visitors to avoid the harm, or otherwise to protect them against it.' " (*Peterson* v. *San Francisco Community College Dist., supra,* 36 Cal.3d at p. 807, quoting Rest.2d Torts, § 344.) [¶] "The Restatement Second of Torts, section 344, comment (f) further details the circumstances under which such a duty arises: 'Since the [owner of land] is not an insurer of the visitor's safety, he is ordinarily under no duty to exercise any care until he knows or has reason to know that the acts of the third person are occurring, or are about to occur. He may, however, know or have reason to know, from past experience, that there is a likelihood of conduct on the part of third persons in general which is likely to endanger the safety of the visitor, even though he has no reason to expect it on the part of any particular individual. *If the place or character of his business, or his past experience, is such that he should reasonably anticipate careless or criminal conduct on the part of third persons, either generally or at some particular time, he may be under a duty to take precautions against it, and to provide a reasonably sufficient number of servants to afford a reasonable protection.*' " (*Isaacs* v. *Huntington Memorial Hospital, supra,* 38 Cal.3d at p. 124; *Cohen* v. *Southland Corp., supra,* 157 Cal.App.3d at p. 138, italics in original.)

*Coulter* v. *Superior Court* (1978) 21 Cal.3d 144, 152-154 [145 Cal.Rptr. 534, 577 P.2d 669].) Within this analysis, the "court's task—in determining 'duty'—is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party." (*Ballard* v. *Uribe, supra,* 41 Cal.3d at p. 572, fn. 6.)[5] ▮▮ ▮▮▮▮ Viewed in this light, the question of foreseeability in a "duty" context is a limited one for the court, and readily contrasted with the fact-specific foreseeability questions bearing on negligence (breach of duty) and proximate causation posed to the jury or trier of fact. (*Ibid.*)[6]

To fully comprehend the concept of "duty" as defined by the risks which are reasonably perceived or foreseeable, the language of *Dillon* v. *Legg, supra,* 68 Cal.2d at page 739, serves as a useful guide. ▮▮ "Defendant

---

[5]Inevitably, judicial explanation of a complex legal concept simply begets a new inquiry into the meaning of the explanation. The Supreme Court has provided no guide as to the meaning of "category of negligent conduct". Granted, its meaning within this standard cannot be overly general and abstract, for then any harm suffered by a plaintiff could be linked to the category of a defendant's misconduct. Foreseeability would become a meaningless consideration, because no harm could ever be unforeseeable. Conversely, if the category is construed too closely to the particular facts of the case, the court's foreseeability analysis would impermissively infringe upon the trier-of-fact's more factually focused consideration of foreseeability within the context of whether defendant's conduct was negligent and further whether it was a proximate or legal cause of plaintiff's injury. (See *Ballard* v. *Uribe, supra,* 41 Cal.3d at p. 572, fn. 6.)

[6]Although the breadth of "duty" is decided by the court as a question of law dependent upon a variety of relevant factors including foreseeability of the risk of harm as the principal consideration (*Ballard* v. *Uribe, supra,* 41 Cal.3d at p. 572, fn. 6; *Hedlund* v. *Superior Court* (1983) 34 Cal.3d 695, 705 [194 Cal.Rptr. 805, 669 P.2d 41, 41 A.L.R.4th 1063]; *Coulter* v. *Superior Court, supra,* 21 Cal.3d at p. 152; *Gomez* v. *Ticor* (1983) 145 Cal.App.3d 622, 627 [193 Cal.Rptr. 600]; *Musgrove* v. *Ambrose Properties* (1978) 87 Cal.App.3d 44, 52 [150 Cal.Rptr. 722]), it is often misleadingly stated that although duty is a question of law, foreseeability is a question of fact which must be decided by the trier of fact in any case about which reasonable minds can differ (*Bigbee* v. *Pacific Tel. & Tel. Co.* (1983) 34 Cal.3d 49, 56 [192 Cal.Rptr. 857, 665 P.2d 947]; *Weirum* v. *RKO General, Inc., supra,* 15 Cal.3d at p. 46; *Gregorian* v. *National Convenience Stores, Inc., supra,* 174 Cal.App.3d at p. 948; *Cohen* v. *Southland Corp., supra,* 157 Cal.App.3d at p. 138; *Gomez* v. *Ticor, supra,* 145 Cal.App.3d at p. 627; *Musgrove* v. *Ambrose Properties, supra,* 87 Cal.App.3d at p. 52; *Wright* v. *Arcade School Dist.* (1964) 230 Cal.App.2d 272, 277 [40 Cal.Rptr. 812]). To the contrary, where it is one factor to which a court looks in defining the boundaries of "duty", foreseeability of the particular kind of harm is strictly a question of law when evaluated within the general context of "whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party." (*Ballard* v. *Uribe, supra,* 41 Cal.3d at p. 572, fn. 6; *Clarke* v. *Hoek* (1985) 174 Cal.App.3d 208, 214 [219 Cal.Rptr. 845].) However, foreseeability is a question of fact, which must be decided by a trier of fact, in any case about which reasonable minds can differ within the more focused, fact-specific settings of breach of duty and causation. (*Ibid;* see also *Constance B.* v. *State of California* (1986) 178 Cal.App.3d 200, 206-207 [223 Cal.Rptr. 645].)

owes a duty, in the sense of a potential liability for damages, only with respect to those risks or hazards whose likelihood made the conduct unreasonably dangerous, and hence negligent, in the first instance. [Citations.]

". . . . The obligation turns on whether the offending conduct foreseeably involved unreasonably great risk of harm to the interests of someone other than the actor. . . . [T]he obligation to refrain from . . . particular conduct is owed only to those who are foreseeably endangered by the conduct and only with respect to those risks or hazards whose likelihood made the conduct unreasonably dangerous. Duty, in other words, is measured by the scope of the risk which negligent conduct foreseeably entails." (*Ibid,* quoting 2 Harper & James, The Law of Torts (1956), p. 1018, fns. omitted; *Rodriguez v. Bethlehem Steel Corp.* (1974) 12 Cal.3d 382, 399 [115 Cal.Rptr. 765, 525 P.2d 669].)

Thus, the court determines whether the risk of harm was reasonably foreseeable, charting out the areas of liability and excluding the remote and unexpected. (*Dillon v. Legg, supra,* 68 Cal.2d at p. 741; *Rodriguez v. Bethlehem Steel Corp., supra,* 12 Cal.3d at p. 399; *George A. Hormel & Co. v. Maez* (1979) 92 Cal.App.3d 963, 968 [155 Cal.Rptr. 337, 15 A.L.R.4th 1141]; *Musgrove v. Ambrose Properties, supra,* 87 Cal.App.3d at p. 52.)[7]

---

[7] An analysis of the decisional trend of theoretical negligence liability in California shows clearly that "*Dillon* (68 Cal.2d at p. 741) postulated reasonable foreseeability as the primary, court-determined test of liability and relegated to a secondary, negative role the policy factors involved in the duty-of-care issue." (*Adams v. Southern Pac. Transportation Co.* (1975) 50 Cal.App.3d 37, 41-42 [123 Cal.Rptr. 216], disapproved on other grounds in *J'Aire Corp. v. Gregory, supra,* 24 Cal.3d at p. 807.) *Rowland v. Christian, supra,* 69 Cal.2d at p. 108 set forth Civil Code section 1714 as the fundamental rule of negligence liability in California, casting aside the common law rules which had traditionally limited liability of landowners. "*Dillon* and *Rowland* . . . move[d] the duty-of-care inquiry from its conventional position as the starting point of liability analysis and relegate[d] it to a secondary, rejective role. Inferably, *Rowland v. Christian* relies—no less than *Dillon v. Legg*—upon foreseeability of harm as the prime test of negligence liability." (*Id.* at p. 42.) In other words, "[b]oth emphasize (*Dillon* expressly and *Rowland* implicitly) the primacy of case-by-case determinations of reasonable foreseeability; both relegate the duty test to a secondary role as a safeguard against remote and unexpected liabilities. 'The defendant owes a duty of care to all persons who are foreseeably endangered by his conduct, with respect to all risks which make the conduct unreasonably dangerous.' " (*Id.* at pp. 44-45, quoting *Rodriguez v. Bethlehem Steel Corp., supra,* 12 Cal.3d at p. 399, citing *Dillon v. Legg, supra,* 68 Cal.2d at p. 741.) The theory that *Weirum v. RKO General, Inc., supra,* 15 Cal.3d at page 40, transferred to the jury the determination of duty whenever the remaining *Rowland* factors did not outweigh the importance of foreseeability (see Comment, *The Death of Palsgraf, A Comment on the Current Status of the Duty Concept in California* (1979) 16 San Diego L.Rev. 793, 801-810) must be rejected in light of the language in *Ballard v. Uribe, supra,* 41 Cal.3d at page 572, footnote 6, recognizing the question of duty is decided by the court after considering the foreseeability of the particular kind of harm. The court characterized the judicial inquiry as the general evaluation of whether the category of negligent conduct involved is sufficiently likely to result in the kind of harm experienced warranting imposition of liability on the negligent party. The court contrasted the role of the jury by emphasizing the latter's consideration of foreseeability within the more

██ Foreseeability is but one factor to be weighed in determining whether a landowner owes a duty in a particular case and is an elastic factor within a somewhat flexible concept. (*Isaacs* v. *Huntington Memorial Hospital, supra,* 38 Cal.3d at p. 125.) In other words, "[t]he degree of foreseeability necessary to warrant the finding of a duty will thus vary from case to case. For example, in cases where the burden of preventing future harm is great, a high degree of foreseeability may be required. [Citation.] On the other hand, in cases where there are strong policy reasons for preventing the harm, or the harm can be prevented by simple means, a lesser degree of foreseeability may be required. [Citation.]" (*Gomez* v. *Ticor, supra,* 145 Cal.App.3d at pp. 629-630.)

In pursuing this inquiry, it is necessary to review the "totality of the circumstances" including the nature, condition and location of the defendant's premises (*Isaacs* v. *Huntington Memorial Hospital, supra,* 38 Cal.3d at p. 129), in light of the firmly established rule that "what is required to be foreseeable is the general character of the event or harm . . . not its precise nature or manner of occurrence. [Citations.]" (*Id.* at p. 129, quoting *Bigbee* v. *Pacific Tel. & Tel. Co., supra,* 34 Cal.3d at pp. 57-58.)

██ Guided by the foregoing, we conclude as a matter of law the *Rowland* factors and specifically the unforeseeability of the unique, horrific San Ysidro event require negligence liability to be restricted here.[8] First, as to the foreseeability of harm to plaintiffs, the theft-related and property crimes of the type shown by the history of its operations, or the general assaultive-type activity which had occurred in the vicinity bear no relationship to purposeful homicide or assassination. In other words, under all the circumstances presented, the risk of a maniacal, mass murderous assault is not a hazard the likelihood of which makes McDonald's conduct unreasonably dangerous. Rather, the likelihood of this unprecedented murderous assault was so remote and unexpected that, as a matter of law, the general character of McDonald's nonfeasance did not facilitate its happening. Huberty's deranged and motiveless attack, apparently the worst mass killing by a

focused, fact-specific settings of breach of duty and causation. (See contra *Wright* v. *Arcade School Dist., supra,* 230 Cal.App.2d at p. 279, declaring: "Where the ultimate determination of duty rests upon the foreseeability of harm, it becomes a fact question for the jury rather than a law question for the court.")

[8] The notion it is inappropriate to apply the *Rowland* analysis to this case because it is already firmly settled a business establishment generally owes an affirmative duty to its customers to take reasonable precautions to protect them from reasonably anticipated criminal conduct of unknown third parties is fallacious. Not only does this recognized general duty rest upon a determination the third party's wrongful conduct was reasonably foreseeable under the circumstances, but also such a notion is inconsistent with the Supreme Court's analysis in *Isaacs* v. *Huntington Memorial Hospital, supra,* 38 Cal.3d at pages 123-129, acknowledging this general duty is simply the springboard from which a court determines whether one owes another a duty of care under the circumstances by applying the *Rowland* analysis.

single assailant in recent American history,[9] is so unlikely to occur within the setting of modern life that a reasonably prudent business enterprise would not consider its occurrence in attempting to satisfy its general obligation to protect business invitees from reasonably foreseeable criminal conduct.

Plaintiffs' reliance on the evidence of mostly theft-related crimes on and nearby the San Ysidro premises and the crime rate in the surrounding area, to show the event here was reasonably foreseeable, is misplaced. We recognize foreseeability of third-party criminal conduct does not require prior identical or even similar incidents. (*Isaacs* v. *Huntington Memorial Hospital, supra,* 38 Cal.3d at p. 112.) However, here the proffered evidence does not portend disasters of this type. As McDonald's argues: "To the extent it can be foreseen at all, such an attack, like a meteor falling from the sky, can occur in any neighborhood regardless of the crime rate." Rather, the predominantly theft-related character of the crimes is simply probative of the foreseeability of such crimes, more precisely defining its duty to provide protective measures designed to deter theft-related and ordinary criminal conduct (i.e., vandalism). In comparison, not only was Huberty's crime not theft-related, but the narrow focus on slaughter and Huberty's obvious suicidal motive are unrelated to the area's general crime rate as a matter of law.

The plaintiffs challenge any characterization of the type of harm based on its tragic dimensions.[10] In other words, plaintiffs assert that if any violent crime on the premises was foreseeable, it should not matter what type of crime in fact occurred. They argue victims of less heinous crimes should not have a better chance to recover from their injuries than those who suffer

---

[9] Before this massacre, the following major mass murders had been committed in the United States during recent history: (1) August 1, 1966, 16 people were killed and 31 wounded by a rifle-sniper firing from the University of Texas tower in Austin; (2) August 20, 1986, 14 postal workers were killed and six others wounded in Edmond, Oklahoma; (3) February 19, 1983, 13 Chinese-American businessmen and gambling dealers were shot dead in a Seattle Chinatown gambling club; (4) September 25, 1982, 13 people were killed in a shooting rampage in Wilkes-Barre, Pennsylvania by a state prison guard; (5) September 6, 1949, 13 people were killed by a World War II veteran who went berserk in Camden, New Jersey; (6) January 1958, 11 people were killed by two individuals during a spree in Lincoln, Nebraska; (7) April 15, 1984, 10 people died in New York City's "Palm Sunday Massacre"; and (8) July 14, 1966, eight nurses were slain in their Chicago apartment by Richard Speck. (The San Diego Union, Saturday, April 25, 1987, sec. A-8, col. 1, 2.)

[10] In fact, plaintiffs contend the trial court violated their due process and equal protection rights by focusing on the nature of the crime and not the facts establishing the duty to protect against such a crime. In other words, they challenge any distinction which would promote multiple crime victim situations being treated any differently than single victim crime situations. However, no such distinction exists. We simply apply a uniform approach of evaluating a series of policy considerations, the principal of which is foreseeability of the risk of harm, to determine whether liability should be restricted.

from more heinous crimes. However, although we may not consider the particular nature of a plaintiff's injuries and the particular nature of a defendant's conduct, we do evaluate the kind of third-party conduct involved in light of the total surrounding circumstances because they are probative in determining generally whether the category of McDonald's negligent conduct is sufficiently likely to result in the kind of harm experienced. (*Ballard* v. *Uribe, supra,* 41 Cal.3d at p. 572, fn. 6.) The characterization of the type of harm experienced here as a mass murderous assault is a sufficiently descriptive general, but factually accurate, hazard from which we can determine the foreseeability of the particular risk without violating the settled rule that what is required to be foreseeable is simply the general character of the event or harm and not its precise nature or manner of occurrence. (*Isaacs* v. *Huntington Memorial Hospital, supra,* 38 Cal.3d at p. 129.)[11]

A review of the surrounding circumstances emphasized by plaintiffs does not render the occurrence of a mass murderous assault any more foreseeable. First, Holley's deposition relating his bid to sell security to McDonald's simply proves it knew of the high crime area and the availability of uniformed, licensed security officers at $5.75 per hour. Unlike the parking structures in *Isaacs* v. *Huntington Memorial Hospital, supra,* 38 Cal.3d at page 112 and *Gomez* v. *Ticor, supra,* 145 Cal.App.3d 622, and the all-night convenience stores in *Gregorian* v. *National Convenience Stores, Inc., supra,* 174 Cal.App.3d at page 944, and *Cohen* v. *Southland Corp., supra,* 157 Cal.App.3d at page 130, a fast-food restaurant does not create "an especial temptation and opportunity for criminal misconduct" (*Gomez* v. *Ticor, supra,* 145 Cal.App.3d at pp. 628-629) of this nature. In other words, McDonald's facilities, even considering the alleged construction defects of the tinted windows and the restaurant's elevation above the other buildings in the surrounding area, did not present a particular risk for this type of criminal attack.[12]

---

[11] Our characterization appears to be more general than that employed by the Supreme Court in *Bigbee* v. *Pacific Tel. & Tel. Co., supra,* 34 Cal.3d at pages 57-58. There, focusing on foreseeability within the context of breach of duty and causation, the general character of the event or harm was described as "being struck by a car while standing in a phone booth". Moreover, in *Gregorian* v. *National Convenience Stores, Inc., supra,* 174 Cal.App.3d at pages 949-950, the court characterized the type of harm within a third-party context as a "sudden attack of a ruthless young gang" and "gang violence". Additionally, in *Gomez* v. *Ticor, supra,* 145 Cal.App.3d at page 628, footnote 1, the foreseeable harm was generally characterized as an "attack on a patron who interrupts a criminal act." However, in *Cohen* v. *Southland Corp., supra,* 157 Cal.App.3d at page 140, this court described the general character of the foreseeable harm as an "injury of a store customer present during a criminal act."

[12] Compare *Gregorian* v. *National Convenience Stores, Inc., supra,* 174 Cal.App.3d at page 950, where the court found unforeseeable as a matter of law an assault and stabbing at an all-night convenience store by 8 to 10 gang members who forced their way into the store, acknowledging "the proprietor of an allnight convenience store may, in this day and age, rea-

Applying several *Rowland* factors and policy considerations establishes that negligence liability should be restricted here. Preliminarily, under these circumstances, it would be difficult for a trier of fact to discern a causal nexus between McDonald's nonfeasance and the resulting injuries where reasonable precautions would not likely deter a suicide-bent murderer or protect his random victims from harm. Moreover, within the context of the third-party criminal conduct involved here, no moral blame attaches to defendant's nonfeasance. Further, although the policy of preventing future harm is great, the extent of the burden to the defendant and the consequences to the community of imposing a duty to protect against heavily-armed, suicidal murderers is onerous. As already explained, where the burden of preventing future harm is great, a high degree of foreseeability is required. (*Isaacs* v. *Huntington Memorial Hospital, supra,* 38 Cal.3d at p. 125; *Gomez* v. *Ticor, supra,* 145 Cal.App.3d at p. 629.) Absent such a high degree of foreseeability, the courts have declined to declare a duty where its imposition "would place an extremely onerous burden on both the defendant and the community, and where the defendant is not morally culpable, and where the proposed duty and the measures to be applied in discharge of the duty defy exact delineation and suffer from inherent vagueness . . . ." (*Cohen* v. *Southland Corp., supra,* 157 Cal.App.3d at p. 142.) Finally, without infringing upon the issue of causation, what protective measures should be pursued to protect against a mass murderous assault truly defy exact delineation, because how can one know which measures will be effective against a degenerate, a psychopath or a psychotic. (See *Noble* v. *Los Angeles Dodgers, Inc.* (1985) 168 Cal.App.3d 912, 918 [214 Cal.Rptr. 395].) Unlike *Cohen* v. *Southland Corp., supra,* 157 Cal.App.3d at page 130 and *Gomez* v. *Ticor, supra,* 145 Cal.App.3d at pages 632-633, where minimal precautionary measures providing a "vital first line of defense" could have had an appreciable effect in preventing the lesser crimes they addressed, none apparently exist here as neither party has suggested such a measure.[13]

---

sonably anticipate that his place of business will be the target of armed robbers. . . ." The *Gregorian* court aptly stated: "[P]laintiff's injuries were the result of an extraordinarily malicious criminal act that, based on defendants' past experience and knowledge, could not have been anticipated." (*Id.* at pp. 950-951.)

[13] We do not imply a business establishment can be sheltered from liability by nonfeasance and ignoring its obligation to make its establishment reasonably safe against foreseeable criminal conduct to third parties. Rather, we simply acknowledge that the type of unforeseeable criminal conduct involved here would require expensive protective measures of questionable deterrent value when confronted by an assailant bent on committing a mass murder. In other words, the kind of harm involved here cannot be deterred by such measures as security cameras and alarms which help deter ordinary criminal conduct because of the potential of identification and capture.

## IV

### THERE WAS NO CAUSAL CONNECTION BETWEEN McDONALD'S NONFEASANCE AND PLAINTIFFS' INJURIES AS A MATTER OF LAW[14]

 Apart from any "duty" analysis, the extraordinary facts of this case show as a matter of law there is no potential causal connection between McDonald's failure to provide security and plaintiffs' injuries.

 Actionable negligence comprises three distinct elements: Legal duty to use due care, a breach of that duty, and a proximate or legal causal connection between the breach and the injuries suffered by plaintiffs. (*United States Liab. Ins. Co.* v. *Haidinger-Hayes, Inc.* (1970) 1 Cal.3d 586, 594 [83 Cal.Rptr. 418, 463 P.2d 770]; *Harris* v. *City of Compton* (1985) 172 Cal.App.3d 1, 8 [217 Cal.Rptr. 884]; *E. F. Hutton & Co.* v. *City National Bank* (1983) 149 Cal.App.3d 60, 66 [196 Cal.Rptr.614].) Assuming the special relationship between a business establishment and its customers as a matter of law places an affirmative "duty" on McDonald's to take reasonable precautions to protect its patrons from Huberty's criminal conduct (*Isaacs* v. *Huntington Memorial Hospital, supra,* 38 Cal.3d at p. 123; *Taylor* v. *Centennial Bowl, Inc., supra,* 65 Cal.2d at p. 121; *Gregorian* v. *National Convenience Stores, Inc., supra,* 174 Cal.App.3d at pp. 948-949; *Marois* v. *Royal Investigations and Patrol, Inc., supra,* 162 Cal.App.3d at p. 199; *Cohen* v. *Southland Corp., supra,* 157 Cal.App.3d at pp. 137-138), the primary issue here is causation, as it is undisputed McDonald's failed to take any protective or precautionary measures to safeguard its patrons from the reasonably foreseeable conduct of unknown third parties. The determination whether McDonald's breach of its duty to protect its patrons caused plaintiffs' injuries is usually within the jury's domain; but, where reasonable men will not challenge the absence of causality, the court may treat the question as one of law and take the decision from the jury. (*Constance B.* v. *State of California, supra,* 178 Cal.App.3d at p. 207.) "The standard is high for finding as a matter of law that the material facts show a lack of causality . . . , but is not unmeetable." (*Ibid.*)

 Given the nonfeasance nature of McDonald's conduct, we must first determine what reasonable protective measures McDonald's should

---

[14] The trial court granted summary judgment on the ground McDonald's owed no duty to plaintiffs as a matter of law under the circumstances without addressing the issue of causation. However, we review the correctness of the trial court's decision and judgment, not the correctness of the grounds persuading the trial court to reach its conclusion. (*Constance B.* v. *State of California, supra,* 178 Cal.App.3d at p. 211; 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 259, p. 266.)

have taken under the circumstances before we can address the issue of causation. (*Noble* v. *Los Angeles Dodgers, Inc., supra,* 168 Cal.App.3d at p. 917.) The predominately theft-related character of those crimes summarized in the statistics proffered by plaintiffs regarding crimes committed on the restaurant premises during the approximate 3-1/2 year period before this incident clearly establishes McDonald's at a minimum should have provided protective measures such as security cameras and alarms designed to deter theft-related and ordinary criminal conduct because of the potential of identification and capture. The further crime summaries and statistics regarding areas within one-and two-tenths of a mile radius of the restaurant and the FBI index for the 1983-1984 fiscal year comparing the San Ysidro crime rate with that of the city-wide crime rate, combined with those portions of the deposition testimony of plaintiffs' security expert, Holley, at most establish McDonald's should have provided under the circumstances a uniformed, licensed security guard. The Jack-in-the-Box restaurant employed uniformed, licensed security people not characterized as "armed". The offer to provide security at $5.75 per hour to McDonald's was for uniformed, licensed security officers, without any indication they would be armed. Finally, a review of the security systems of the 24 neighboring businesses, ranging from armed guards, closed circuit T.V., alarm systems with and without mobile security response to periodic roving, mobile security patrols, discloses that only foreign currency exchanges employed armed security guards on the premises, as no like family restaurant employed any security guards except for the Jack-in-the-Box noted above. (See *Bullis* v. *Security Pac. Nat. Bank* (1978) 21 Cal.3d 801, 809 [148 Cal.Rptr. 22, 582 P.2d 109, 7 A.L.R.4th 642][15]; 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 498, pp. 2764-2765.)

In *Cohen* v. *Southland Corp., supra,* 157 Cal.App.3d at page 142, where defendants argued the duty involved there was tantamount to the requirement of hiring full-time armed security guards in the hope of deterring night-time crime at 7-11 franchises, we responded they had misapprehended the scope of the duty involved, explaining that obtaining reasonable safety for patrons against criminal activity was not coincident with requiring the hiring of armed guards but rather that duty could be adequately fulfilled by other less onerous, relatively inexpensive robbery and/or violence deterrence measures . We are satisfied that, as a matter of law, McDonald's duty to provide protective services would not extend beyond providing

---

[15] "The standard of care required in a particular circumstance may be based on a statute [citation] or the custom and practice in the relevant community. [Citations.] While the custom in the community does not necessarily establish how a reasonable person must act, it is evidence to be considered in determining the proper standard of care. [Citations.]" (*Bullis* v. *Security Pac. Nat. Bank, supra,* 21 Cal.3d at p. 809.)

an *unarmed,* uniformed, licensed security guard as offered by Holley of Allegiance Security Incorporated.[16]

We must now determine whether as a matter of law McDonald's failure to provide an unarmed security guard constitutes a proximate or legal cause of the resulting injuries suffered by plaintiffs here. All plaintiffs need to show to establish proximate, or legal, causation is that McDonald's nonfeasance in some way contributed to their resulting injuries. (*Valdez* v. *J. D. Diffenbaugh Co.* (1975) 51 Cal.App.3d 494, 508 [124 Cal.Rptr. 467].) ■■■■ In other words, could any jury find McDonald's failure to provide unarmed, uniformed, licensed security personnel constituted a substantial factor in causing the resulting injuries (*Willis* v. *Gordon* (1978) 20 Cal.3d 629, 635 [143 Cal.Rptr. 723, 574 P.2d 794]),[17] by either effectively deterring such criminal conduct or limiting the scope of the resulting injuries? Otherwise stated, McDonald's negligent conduct is not a substantial factor in bringing about plaintiffs' injuries if their injuries would have been sustained even if it had provided the unarmed, uniformed, licensed security guard. (Rest.2d Torts, § 432, subd. (1).) ■■ More precisely, ". . . where the actor's tortious conduct consists in a failure to take some precautions which are required for the protection of another's person or land or chattels[,] . . . if the same harm, both in character and extent, would have been sustained even had the actor taken the required precautions, his failure to do so is not even a perceptible factor in bringing it about and cannot be a substantial factor in producing it." (Com. b on subd. (1) of Rest.2d Torts, § 432.)[18]

This case constitutes a classic example of plaintiffs establishing "abstract negligence" in that McDonald's security failed to conform with their expert's notion of adequacy as requiring the hiring of a uniformed, licensed

---

[16] Granted, a trier of fact could perhaps determine a reasonable protective measure McDonald's could have pursued was that of a periodic roving, mobile security patrol with armed guards. However, it is doubtful the reaction time of such a patrol would have been better than that of law enforcement here (seven minutes).

[17] We note that cause in fact is but a necessary condition precedent to the determination of whether the negligent act or omission constitutes the proximate or legal cause of the plaintiffs' injuries. (See 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 620, pp. 2901-2905; Prosser & Keeton on Torts (5th ed. 1984) §§ 41-42, pp. 263-280.) In other words, cause in fact is not necessarily the sine qua non of proximate cause, but the former reflects the necessity of a sufficient factual nexus between the negligent conduct and the injury while the latter represents the legal determination encompassing all the ill-defined considerations of policy which go to limit liability once cause in fact has been established.

[18] Illustration "1" to Comment on subdivision (1) of Restatement Second of Torts, section 432, provides: "A statute requires all vessels plying on the Great Lakes to provide lifeboats. One of the A Steamship Company's boats is sent out of port without any such lifeboat. B, a sailor, falls overboard in a storm so heavy that had there been a lifeboat it could not have been launched in the sea then running. B is drowned. The A Company's failure to provide lifeboats is not a cause of B's death."

security guard, without establishing any causal nexus between this failure and the resulting injuries. (See *Noble* v. *Los Angeles Dodgers, Inc., supra,* 168 Cal.App.3d at pp. 916-918.) Here, the plaintiffs' reliance on Holley's deposition testimony, where he opined, without support, the use of security at the restaurant would have acted as a deterrent and could have prevented the massacre, is misplaced. He further noted that no visible security existed at McDonald's, while the nearby Jack-in-the-Box employed uniformed security people. He also declared on the basis of his personal experience, the use of security devices or personnel reduced the incidents of crime and theft. However, noticeably absent from his testimony is the opinion that the specific use of an unarmed, uniformed, licensed security guard would have acted as a deterrent and prevented the event or even minimized the extent of the harm suffered by plaintiffs. This omission is understandable; for, "it is one thing for an expert to testify concerning the mechanical devices such as locks, safes, fences, etc. which are designed to protect property by 'hardening the target,' it is quite another for such expert to discuss deterring conduct such as rape, robbery or physical assaults. [¶] As one court has stated: ' "It is an easy matter to know whether a stairway is defective and what repairs will put it in order. . . . but how can one know what measures will protect against the thug, the narcotic addict, the degenerate, the psychopath and the psychotic?" [Citation.]' [Citation.]" (*Noble* v. *Los Angeles Dodgers, Inc., supra,* 168 Cal.App.3d at p. 918.) In fact, " '[n]o one really knows why people commit crime, hence no one really knows what is "adequate" deterrence in any given situation. While bright lights may deter some, they will not deter all. Some persons cannot be deterred by anything short of impenetrable walls and armed guards.' " (*Gregorian* v. *National Convenience Stores, Inc., supra,* 174 Cal.App.3d at pp. 949-950, quoting *7735 Hollywood Blvd. Venture* v. *Superior Court* (1981) 116 Cal.App.3d 901, 905 [172 Cal.Rptr. 528].)

▮ Under the circumstances here, it cannot be reasonably urged that had McDonald's provided an unarmed, uniformed licensed security guard, the massacre would have been prevented or its extent diminished. The record defies such a conclusion. Rather, it paints a portrait of a demented, mentally unbalanced man, bent on murder and self-destruction, who viewed the nearby McDonald's restaurant with his binoculars from his apartment, kissed his wife goodbye and stated he was going "hunting for humans." Huberty set out to kill the most people possible and went to the restaurant, unconcerned with detection, dressed in camouflage fatigue pants and heavily armed. Upon entry into the restaurant, he immediately began firing his weapons indiscriminately at everything and everyone in sight, reloading his weapons periodically and walking up and down the aisles slaughtering those he found still alive. His only apparent motive was killing. He made no effort to rob the restaurant, made no demands for money, and made no effort to

take hostages. His indiscriminate slaughter of human beings—the worst mass killing by a single assailant in recent American history—only ended when he believed all were dead and he was felled by a police sharpshooter.

On this record, we conclude plaintiffs have failed to establish any triable issue that there was a causal nexus between McDonald's nonfeasance, if any, and the resulting injuries. Any reasonable protective measure such as security cameras, alarms and unarmed security guards, might have deterred ordinary criminal conduct because of the potential of identification and capture, but could not reasonably be expected to deter or hinder a maniacal, suicidal assailant unconcerned with his own safety, bent on committing mass murder.

## DISPOSITION

Judgment affirmed.

**WEINER, Acting P. J.**—I concur for the reasons set forth in section IV.

**BUTLER, J.**—I concur. The conclusion McDonald's did not have a duty to protect these unfortunate victims from Huberty's brief reign of terror is correct. As foreseeability is a consideration in the determination of that duty, and McDonald's owed no duty to protect the victims from Huberty, the lack of causal connection is necessarily subsumed in the duty analysis. Thus, I do not reach the issue of causation set out in section IV.

Petitions for a rehearing were denied August 4, 1987.