132 Cal.Rptr.2d 883 (2003)
107 Cal.App.4th 1429
Aaron WIENER et al., Plaintiffs and Appellants,
v.
SOUTHCOAST CHILDCARE CENTERS, INC. et al, Defendants and Respondents.
No. G028814.
Court of Appeal, Fourth District, Division Three.
April 22, 2003.
Review Granted July 30, 2003.
*884 Law Offices of Ginsburg & Hlywa and Evan L. Ginsburg, Fullerton, for Plaintiffs and Appellants Aaron Wiener and Pamela Wiener.
Law Offices of Federico Castelan Sayre and Daniel H. Cargnelutti, Santa Ana, for Plaintiffs and Appellants Eric Soto and Cindy Soto.
McKay, Byrne & Graham, John P. McKay, Michael A. Byrne, Los Angeles, and David R. Denton, for Defendant and Respondent First Baptist Church of Costa Mesa.
Jeffery & Grosfeld and Mona J. Jeffery for Defendant and Respondent Southcoast Childcare Centers, Inc.

OPINION
BEDSWORTH, J.
This lawsuit is rooted in tragedy. Steven Abrams drove his car through a four-foot high chain link fence and onto the playground of the Southcoast Early Childhood Learning Center (Southcoast), with the intent of killing children playing there. *885 He succeeded in killing two, Brandon Wiener and Sierra Soto. Plaintiffs Aaron and Pamela Wiener, the parents of Brandon, and Eric and Cindy Soto, the parents of Sierra, sued defendants Southcoast and the owner of the property, First Baptist Church of Costa Mesa (the Church), alleging negligence and premises liability.[1] The trial court granted summary judgment in favor of defendants, concluding that without notice of prior similar crimes in the area, defendants could not have foreseen Abrams' criminal act and thus had no duty to protect against it.
We reverse the judgment. For purposes of evaluating whether a duty is owed, the issue of "foreseeability" refers to whether the defendants' alleged negligent conduct created a foreseeable risk of a particular kind of harm, not whether the specific conduct of a particular third party wrongdoer could be anticipated. In this case, the defendants' alleged negligence was their failure either to erect a sufficiently sturdy barrier between the playground and the immediately adjacent busy street, or to move the children to a more protected area, thus guarding against the danger of their being hit by errant automobile traffic. That is the very harm which came to pass. We conclude plaintiffs offered sufficient evidence of the foreseeability of that harm to preclude summary judgment in favor of defendants in this case.

* * *
Plaintiffs' complaint alleged that Southcoast was situated on a busy street corner on Santa Ana Avenue in Costa Mesa, and that the playground was located immediately adjacent to that street. The playground was enclosed by only a four-foot high chain link fence, which was assertedly inadequate to protect the children from errant automobile traffic coming off of the street. Plaintiffs alleged that defendants were aware the fence was inadequate, and that Sheryl Hawkinson, the owner of Southcoast, had previously requested the Church provide funds to erect a more sturdy barrier. When the Church refused, Hawkinson did nothing further to remedy the problem. Plaintiffs alleged that had a more sturdy barrier been erected, or had the children been restricted to playing in a more secure location, such measures would have prevented Abrams from driving his car into the children and killing them.
Defendants each moved for summary judgment, contending that because Abrams' act of driving his car onto the playground was an intentional criminal act, it was unforeseeable and defendants had no duty to protect against it. They also asserted, in the alternative, that their alleged negligence was not the proximate cause of the children's deaths.
The key facts offered in support of defendants' motions were that prior to the date of Abrams' attack, neither the Church nor Southcoast were aware of any "criminal" acts or incidents occurring on or around the daycare property, and they had no notice of "any prior similar acts." But defendants did not assert they lacked notice of the possibility the playground might be generally vulnerable to the hazards of adjacent traffic.
Defendants' motions relied primarily on Ann M. v. Pacific Plaza Shopping Center (1993) 6 Cal.4th 666, 25 Cal.Rptr.2d 137, 863 P.2d 207 (Ann M.). In Ann M., the plaintiff was raped at her workplace, which was located in a shopping center owned by defendants. She alleged that defendants had a duty to protect her from that crime by hiring security guards to patrol the premises. The Supreme Court concluded *886 no such duty existed. It explained that "the scope of the duty is determined in part by balancing the foreseeability of the harm against the burden of the duty to be imposed [citation]" and that "`"in cases where the burden of preventing future harm is great, a high degree of foreseeability may be required. [Citation.] On the other hand, in cases where ... the harm can be prevented by simple means, a lesser degree of foreseeability may be required." [Citation.]' [Citation.] Or, as one appellate court has accurately explained, duty in such circumstances is determined by a balancing of foreseeability of the criminal acts against the burdensomeness, vagueness, and efficacy of the proposed security measures. [Citation.]" (Id. at pp. 678-679, 25 Cal.Rptr.2d 137, 863 P.2d 207.)
The Supreme Court noted that the obligation to hire security guards will rarely, if ever, be found to be only a "minimal burden," and that consequently "a high degree of foreseeability is required in order to find that the scope of a landlord's duty of care includes the hiring of security guards." (Ann M., supra, 6 Cal.4th 666, 679, 25 Cal.Rptr.2d 137, 863 P.2d 207.) The court ruled that "the requisite degree of foreseeability rarely, if ever, can be proven in the absence of prior similar incidents of violent crime on the landowner's premises." (Ibid.) Because there was no evidence of prior rapes or other violent assaults on the premises, the court concluded that the defendant landowner's duty of care did not extend to the heavy burden of providing security guards.
In opposition to the motions for summary judgment in this case, plaintiffs contended defendants were aware that the playground was generally vulnerable to errant traffic. Plaintiffs relied upon Bigbee v. Pacific Tel. & Tel. Co. (1983) 34 Cal.3d 49, 192 Cal.Rptr. 857, 665 P.2d 947, for the proposition it is generally foreseeable that errant motorists may inadvertently drive their vehicles off of roads and into adjacent areas. Additionally, plaintiffs offered evidence that in 1996, "a driverless mail truck traveling about 5 miles per hour jumped the curb in front of the defendant Early Childhood Learning Center, went through the fence surrounding the playground and stopped at the same tree where Abrams' car was stopped." That mail truck "knocked down the chain link fence, bending three of the poles to which the fence had been attached." After the truck was removed, the center's owner hurried to restore the fence, "before the parents came by because they would yank their kids out of school if they saw the fence down." Plaintiffs also offered evidence that other cars have veered into the curb in front of the Southcoast playground.[2]
Plaintiffs also relied upon Robison v. Six Flags Theme Parks Inc. (1998) 64 Cal. App.4th 1294, 75 Cal.Rptr.2d 838 (Robison ), for the proposition that the issue of foreseeability, for purposes of evaluating the existence of a duty, does not refer to the foreseeability of specific third party conduct, but instead to the foreseeability that defendant's own conduct has rendered plaintiff vulnerable to a particular kind of harm.
The trial court agreed with defendants, and granted summary judgment. It concluded that "Ann M. ... is controlling in *887 this case." The court explained that "Plaintiffs provided no evidence of prior similar incidents of violent crime as required by Ann M. ..." and concluded that "the acts of Steven Abrams were unforeseeable."

I
"Because plaintiff appeals from an order granting defendants summary judgment, we must independently examine the record to determine whether triable issues of material fact exist." (Saelzler v. Advanced Group 400 (2001) 25 Cal.4th 763, 767, 107 Cal.Rptr.2d 617, 23 P.3d 1143.) In order to prevail on a motion for summary judgment, a defendant has the initial burden of "showing that a cause of action has no merit ... or that there is a complete defense to that cause of action. Once the defendant ... has met that burden, the burden shifts to the plaintiff ... to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto." (Code Civ. Proc., § 437c, subd. (o)(2).) "In performing our de novo review, we must view the evidence in a light favorable to plaintiff as the losing party (Molko v. Holy Spirit Assn. (1988) 46 Cal.3d 1092, 252 Cal.Rptr. 122, 762 P.2d 46), liberally construing [plaintiff's] evidentiary submission while strictly scrutinizing defendants' own showing, and resolving any evidentiary doubts or ambiguities in plaintiffs favor. (Marshak v. Ballesteros (1999) 72 Cal.App.4th 1514, 1517, 86 Cal. Rptr.2d 1; Kaplan v. LaBarbera (1997) 58 Cal.App.4th 175, 179, 67 Cal.Rptr.2d 903.)" (Saelzler v. Advanced Group 400, supra, 25 Cal.4th at pp. 768-769, 107 Cal.Rptr.2d 617, 23 P.3d 1143.)
Moreover, in this case, the summary judgment was granted on the basis that defendants owed no duty to plaintiffs' children to protect against Abrams' intentional act. As explained in Ann M., supra, 6 Cal.4th at p. 674, 25 Cal.Rptr.2d 137, 863 P.2d 207, such a determination must be reviewed de novo: "The existence of a duty is a question of law for the court. [Citations.] Accordingly, [an appellate court will] determine de novo the existence and scope of the duty...." Ann M. clarified that even the issue of "[f]oreseeability, when analyzed to determine the existence or scope of a duty, is a question of law to be decided by the court. [Citations.]" (Id, at p. 678, 25 Cal.Rptr.2d 137, 863 P.2d 207.)
We conclude defendants failed to establish they owed no duty to plaintiffs in the circumstances of this case. The primary flaw in defendants' argument is their characterization of the "duty" at issue. Defendants contend, as they did before the trial court, that the relevant duty was a duty to protect plaintiffs' children from a particular criminal act, i.e., Abrams' specific act of intentional killing. Relying upon Ann M., defendants argue that because that criminal act was entirely unforeseeable, they had no duty to take precautions against it.
However, by focusing on Ann M.'s references to "crime," and emphasizing that Abrams' conduct was intentional, and thus criminal, defendants failed to appreciate the distinctions between this case and Ann M. In fact, as plaintiffs attempted to point out, the issue of "foreseeability" does not depend upon the foreseeability of a particular third party's act, but instead focuses on whether the allegedly negligent conduct at issue created a foreseeable risk of a particular kind of harm,
As explained by the Supreme Court in Rowland v. Christian (1968) 69 Cal.2d 108, 113, 70 Cal.Rptr. 97, 443 P.2d 561, "the major [factors in determining the existence of a duty] are the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, *888 the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved. [Citations.]" (Italics added.)
The Supreme Court later clarified that "[t]he foreseeability of a particular kind of harm plays a very significant role in [the duty] calculus (see Dillon v. Legg [1968] 68 Cal.2d [at p.] 739, 69 Cal.Rptr. 72, 441 P.2d 912), but a court's taskin determining `duty'is not to decide whether a particular plaintiffs injury was reasonably foreseeable in light of a particular defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party." (Ballard v. Uribe (1986) 41 Cal.3d 564, 572-573, fn. 6, 224 Cal.Rptr. 664, 715 P.2d 624, italics added.)
In this case, the "kind of harm" which plaintiffs' children experienced was not "crime," but rather being struck by an automobile driven onto the playground. The nature of that "harm" is not dependent upon the state of mind of the driver inflicting it. In our view, defendants' alleged negligent conductfailing to erect a sufficient barrier between the playground and the adjacent street, or moving the children to a more protected areais "sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed...." (Ballard v. Uribe, supra 41 Cal.3d 564, 572-573, fn. 6, 224 Cal.Rptr. 664, 715 P.2d 624.)[3]
We agree with plaintiffs that Robison v. Six Flags Theme Parks Inc., supra, 64 Cal.App.4th 1294, 75 Cal.Rptr.2d 838, is analogous. In that case, picnickers were injured by an out-of-control car while eating in a designated picnic area located within a parking lot at Magic Mountain. Magic Mountain argued that it had no duty to protect against the harm because the specific circumstances of the accident were so bizarre: "Magic Mountain contends that it was not foreseeable that a developmentally disabled `slow learner' who had never driven and did not know how to drive would attempt to operate a car with a dysfunctional starter motor as it was being push-started, would succeed in starting the engine, but would then panic and fail to control the car or to turn left, and would instead drive directly into the picnic table." (Id. at p. 1298, 75 Cal. Rptr.2d 838.)
The court, however, flatly rejected that contention: "Magic Mountain may have a *889 point that this precise set of facts cannot be considered reasonably foreseeable, but this precise set of facts is not material to the duty analysis. The specific factors which resulted in an out-of-control car whether due to the incompetence, unconsciousness, distraction, inebriation, paralysis or mistake of the driver; to mechanical malfunction; to a car `running away' without a driver; or to some other causeare not the material inquiry. This point was explained in Bigbee v. Pacific Tel. & Tel. Co. [, supra,] 34 Cal.3d [at pp.] 57-58, 192 Cal.Rptr. 857, 665 P.2d 947. In Bigbee, plaintiff was injured when an out-of-control car struck a telephone booth placed near a driveway in a parking lot adjacent to a major thoroughfare. In evaluating the role of foreseeability in determining duty, the Supreme Court stated that `it is settled that what is required to be foreseeable is the general character of the event or harme.g., being struck by a car while standing in a phone boothnot its precise nature or manner of occurrence. (Taylor v. Oakland Scavenger Co. (1941) 17 Cal.2d 594, 600, 110 P.2d 1044; Gibson v. Garcia (1950) 96 Cal.App.2d 681, 684, 216 P.2d 119....)' Bigbee hence concluded that the phone company had a duty to place its phone booths in safe locations or otherwise to protect them, and was liable notwithstanding that the booth had been hit by a drunk driver. [¶] A similar point was made in Bryant v. Glastetter (1995) 32 Cal. App.4th 770, 780, 38 Cal.Rptr.2d 291, where the court stated: `"[A] court's taskin determining `duty'is not to decide whether a particular plaintiffs injury was reasonably foreseeable in light of a particular defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party."' Hence the proper focus of the relevant foreseeability inquiry in the instant case is simply whether it was reasonably foreseeable, in view of the configuration and use of the parking lot and picnic area, that a car might fail to turn left at the word `stop' painted on the pavement, and that picnickers might be injured as a consequence of Magic Mountain's failure to provide an appropriate separation between the parking lot and the picnic area. Even though the precise scenario of a `slow learner' nondriver involved in an effort to push-start a car, etc., may not have been foreseeable, this latter type of unforeseeability does not exonerate Magic Mountain from the consequences of placing an unprotected picnic table directly in the line of traffic." (Robison v. Six Flags Theme Parks Inc., supra, 64 Cal.App.4th at pp. 1298-1299, 75 Cal.Rptr.2d 838, italics omitted.)
In this case, as in Robison, the fact that the intentional nature of Abrams' conduct may not have been foreseeable does not automatically exonerate these defendants from the consequences of placing small children in a virtually unprotected play area adjacent to a busy street. Abrams' murderous intent may not have been foreseeable, but a jury might decide that a car careening onto the street-side playground was foreseeable. Certainly, if defendants had actually allowed the children to play in the busy street, no one would be arguing that such negligence should be excused by the state of mind of a driver who hit them.
Of course, in Ann M., the court had no occasion to consider the situation presented both here and in the Robison case, i.e., where the harm in question (being hit by a car) may have been foreseeable, but not the actual circumstances in which that harm occurred. In Ann M., the harm inflicted, a rape, was by its nature a crime. There are no negligent rapes. Thus, the court properly focused on the foreseeability *890 of crime in determining whether the landowner had a duty of care to provide security guards, a specific crime prevention measure.
In this case, by contrast, the harm inflicted was not inherently criminal. Thus, there was simply no basis to conclude that defendants' prior knowledge of general criminal activity in or around Southcoast's playground (which was the key fact supporting the motions for summary judgment) was in any way related to their ability to foresee that children on the playground might be vulnerable to being hit by a car.
If we were to analogize this case to another situation implicating a landowner's duty to protect against the harm caused by third party "crime," a more apt comparison would be the crime of arson. If a business owner failed to take reasonable steps to maintain fire safety on his premises, such as by failing to maintain clear exit paths, and the premises were later burned causing injury to patrons trapped inside, would the owner's liability for his own negligence be dependent upon whether the fire was the product of accident or arson? We think not. If the cause of the fire were arson, would the issue of forseeability be determined by whether the business was located in a "nice" neighborhood (i.e., no prior crimes) or in a poor one? No. Would it matter if an armed robbery had taken place just down the street six weeks before? Again, no. What would matter would be that fire was foreseeable and the owner had failed to take steps to prepare for that exigency.
And that brings us to the other way in which defendants have misconstrued Ann M. Contrary to defendants' apparent belief, Ann M. does not stand for the general proposition that a landowner never has a duty to provide protection against a third party's intentional misconduct in the absence of prior similar incidents. Instead, the issue in Ann M. was quite specific whether a landowner had the duty to provide security guards as a means of protecting against the hazard of rape. In analyzing that issue, the court emphasized that the scope of the landlord's duty to provide safe premises is dependent largely on balancing the degree of foreseeability of a particular harm against the burden imposed upon the landlord to preventing that harm. Because the burden of providing security guards was quite significant, the court concluded that a high degree of foreseeabilty, including the landowner's knowledge of prior incidents of similar violent assault, was required before such a duty would be imposed.
In this case, however, plaintiffs were not suggesting that defendants breached any duty to provide security guards (or other crime prevention measure) for the playground. Thus, the specific conclusion of Ann M., concerning the duty to provide security guards, is only tangentially precedential here. Instead, plaintiffs' allegation was that defendants should have either installed a more protective barrier between the playground and the street, or restricted the children to playing in some other area.[4] But because defendants offered no evidence in connection with their summary judgment motions addressing the burdensomeness of those protective measures, neither the trial court nor this court is in a position to apply Ann M.'s balancing test. The summary judgment, based upon the conclusion defendants owed no duty to protect plaintiffs *891 children against the danger of being hit by Abrams' car, must be reversed, and the case returned to the trial court so the foreseeability of the danger involved here can be balanced against the burden of erecting a sturdier fence or moving the children.
In reaching this conclusion, however, it should be clear we are by no means suggesting that every owner of commercial property adjacent to automobile traffic would have a duty to barricade the perimeter or otherwise engage in extraordinary measures to prevent automobiles from traveling onto the property and harming patrons, clients or customers of the establishment. To the contrary, in Jefferson v. Qwik Korner Market, Inc. (1994) 28 Cal. App.4th 990, 34 Cal.Rptr.2d 171, this court held that the owner of a convenience store owed no duty, as a matter of law, to erect posts between the parking lot and the sidewalk in front of the store to protect a patron standing on the sidewalk from the danger that a car in the parking lot might jump the curb and run into him. However, the holding in Jefferson depended heavily on two undisputed facts not present here. First, in Jefferson there were "no previous incidents of vehicles striking pedestrians at the market" (Id. at p. 992, 34 Cal.Rptr.2d 171) and thus the accident was not "reasonably foreseeable" (Id. at p. 997, 34 Cal.Rptr.2d 171); and second, there was nothing in the operation of Qwik Korner's business which required a patron to stand in front of the store where he might be vulnerable to a car jumping the curb from the parking lot. In this case, by contrast, there was evidence that cars had veered off the road adjacent to the preschool in the past, and at least one incident in which a vehicle had actually breached the school's chain link fence and traveled across the playground. Moreover, by situating its playground right next to the busy street, the school did require the children to remain in the particularly vulnerable location for substantial periods of time. For these reasons, Jefferson is distinguishable.

II
Defendants also assert that summary judgment was proper because their alleged negligence was not, as a matter of law, the proximate cause of the children's deaths. Defendants cite no particular facts in support of this argument, but simply rely upon Lopez v. McDonald's Corp. (1987) 193 Cal.App.3d 495, 238 Cal.Rptr. 436. Lopez, however, is inapposite. In Lopez, a murderer entered a McDonald's restaurant with several semi-automatic weapons and began indiscriminately shooting people for no apparent reason. As the court explained, "[h]e made no effort to rob the restaurant, made no demands for money, and made no effort to take hostages." (Id, at pp. 516-517, 238 Cal.Rptr. 436.) The perpetrator killed 21 people and wounded 11 others. After initially concluding defendant owed no duty to protect against such an unforeseeable shooting rampage, the court went on to analyze whether the provision of reasonable security measures, including security cameras, alarms and an unarmed security guard, would have even made a difference. It concluded they would not have: "Any reasonable protective measure such as security cameras, alarms and unarmed security guards, might have deterred ordinary criminal conduct because of the potential of identification and capture, but could not reasonably be expected to deter or hinder a maniacal, suicidal assailant unconcerned with his own safety, bent on committing mass murder." (Id. at p. 517, 238 Cal. Rptr. 436.)
This case is different. The proposed protective measures to be taken here were *892 the erection of a barrier sufficient to protect the playground (and the children on it) from errant traffic from the adjacent street, or the restriction of the children to a more secure area. Defendants have offered no evidence that such a barrier (or such restriction) would not have been equally effective against intentional traffic and negligent traffic. Thus, defendants have failed to demonstrate that the proposed safety measures would not have been effective in protecting the children from Abrams' homicidal act.
Of course, defendants might argue that Abrams, if thwarted in one method of killing, would simply have chosen another. But that is merely speculation, and nothing like an undisputed fact at this point. It is possible that Abrams chose to use his car as an instrument of killing precisely because he was incapable of doing so with a gun, a knife or his hands. In fact, Abrams denied even owning a gun. That, and his lengthy, ineffectual contemplation of murdering innocents, suggests he was reluctant to attempt a less cumbersome crime, and committed this one only when his earlier road-rage combined with the reminder that there were unprotected innocents available, caused him to retrace his path and go back after them.[5] Further, in the absence of proof that Abrams specifically intended to kill plaintiffs' children, Brandon and Sierra, it seems highly unlikely that if relegated to a different method or occasion for his attack, Abrams would again have succeeded in killing these particular children. Thus, defendants have utterly failed to establish that even if they had taken the protective measures suggested by plaintiffs, Abrams would have still succeeded in killing either Brandon or Sierra.[6] This certainly looks like a triable issue.

III
Finally, defendants also argue that Abrams' intentional criminal act was a superceding cause of the children's deaths in this case, and thus broke the chain of causation between defendants' alleged negligence and the deaths of Brandon and Sierra. This is simply a different way of packaging defendants'"lack of duty" argument. Whereas duty is a question of law *893 for the court, the issue of whether the independent act of a third party is a superceding cause is an issue of fact for the jury. (Torres v. Xomox Corp. (1996) 49 Cal.App.4th 1, 19, 56 Cal.Rptr.2d 455.)
As explained in Wise v. Thrifty Payless, Inc. (2000) 83 Cal.App.4th 1296, 1305, fn. 3, 100 Cal.Rptr.2d 437, "California courts have rejected the blanket rule that an intervening criminal or tortious act is by its very nature a superseding cause (see, e.g., Bigbee v. Pacific Tel. & Tel. Co. [, supra,] 34 Cal.3d [at p.] 58, 192 Cal.Rptr. 857, 665 P.2d 947; Rosh v. Cave Imaging Systems, Inc. (1994) 26 Cal.App.4th 1225, 1236, 32 Cal.Rptr.2d 136), instead adopting the view that'"[i]f the realizable likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes [the] actor negligent, such an act whether innocent, negligent, intentionally tortious or criminal does not prevent the actor from being liable for harm caused thereby."' (Richardson v. Ham (1955) 44 Cal.2d 772, 777, 285 P.2d 269, citing Rest. Torts, § 449.)" Moreover, as noted by the Supreme Court in Ann M., supra, 6 Cal.4th at p. 678, 25 Cal.Rptr.2d 137, 863 P.2d 207, "[unfortunately, random, violent crime is endemic in today's society. It is difficult, if not impossible, to envision any locale open to the public where the occurrence of violent crime seems improbable."
In this case, the potential hazard which made defendants' failure to erect a more sturdy barrier (or move the children) arguably negligent was that a third party motorist might drive right through the chain link fence and onto the playground, harming the children. Consequently, we could not conclude, as a matter of law, that Abrams' act of doing so, even if done as a random, violent crime, broke the chain of causation between the alleged negligence and the resulting harm.
The judgment is reversed. Plaintiffs are to recover their costs on appeal.
I CONCUR: O'LEARY, J.
SILLS, P.J., Dissenting.
I respectfully dissent. This case arises out of a terrible tragedy, and the afflicted parents deserve our sympathy and condolences. But we should not compound this tragedy by unfairly making an innocent preschool, which had no warning of any prior similar acts, potentially liable for the murderous actions of a third person.
The majority opinion gives insufficient weight to the fact that the villain in this record, Steven Abrams, got the idea of driving his car into a nearby preschool to kill innocent children years prior to the event. As he told officers afterwards, he actually drove by the preschool once before he turned into it, he saw the children, and went by the preschool again with the idea "`to do itafter all the years of thinking about it.'"
Abrams' actions were nothing if not deliberate. As Abrams was driving by the preschool, he made, according to one of the parents who saw the event, "an abrupt right turn" and accelerated. His car, a large 1967 Cadillac Coupe de Ville, was then pointed directly at the playground as he accelerated over the curb, crossed the sidewalk, and knocked down the chain-link fence. At that point, in Abrams' own words, he was "aiming his car `for the children.'" A jury subsequently convicted Abrams of murder, and that conviction was just recently upheld on appeal.
My colleagues say that the preschool may be held responsible for Abrams' murderous acts because there are triable issues as to whether the chain-link fence was strong enough to have prevented Abrams' attack. I disagree. There were absolutely no prior similar acts, which *894 many cases have held in analogous situations to be a prerequisite for any duty to take precautions against the criminal acts of third parties. Nor was there causation. Abrams' intent, in accelerating after he knocked down the fence, showed that no barrier could have prevented this tragedy except a barrier impervious to a head-on crash from a large automobile accelerating into it.
I must disagree with my colleagues' analysis. Their decision simply cannot be reconciled with three Supreme Court cases and a slew of of Court of Appeal decisions dealing with the subjects of both premises liability and, in the unfortunately imprecise phrase used by the majority opinion, "errant traffic." The sole "errant traffic" decision on which my colleagues rely Robison v. Six Flags Theme Parks Inc. (1998) 64 Cal.App.4th 1294, 75 Cal.Rptr.2d 838) is not only factually distinguishable from the situation before us, but itself distinguished criminal acts such as we have before us here from accidental acts, which were before the court there. (See id. at p. 1301, 75 Cal.Rptr.2d 838.)
That indeed is my main disagreement with the majority opinionits lumping criminal acts with accidental ones. My colleagues say that the issue in the case is the "kind of harm" involved, but that is far too broad. Rather, the core issue is the nature of the risk. Justice Cardozo once stated in Palsgraf, the "risk reasonably to be perceived defines the duty to be obeyed." (Palsgraf v. Long Island R. Co. (1928) 248 N.Y. 339, 162 N.E. 99, 100.) Risk defines duty, not generic "kind of harm." [1] There is a difference in risk between a stray bullet from a firing range and a gunshot fired with intent to kill, between accidentally poking someone next to you with a pencil and stabbing him or her with it, between accidentally hitting a pedestrian because you lose control of a car and trying to use the car as a deadly weapon by mowing someone down. In each of these instances the "kind of harm" (from bullets, pencils, or cars) is the same, but the risks are hugely different. Thus, the nature of the risknot the generic "kind of harm"determines the type and scope of the precaution required of the landowner.
My colleagues fail to adequately explain why a deliberate criminal act made with the intention of mowing down innocent children should be treated the same as:
a developmentally disabled person who finds herself at the wheel of a car that has just been push-started and who doesn't know how to stop it (the facts in Robison); or
an intoxicated driver who loses control of a speeding car and veers off into an old-style telephone booth from which a pedestrian cannot escape in time (the facts in Bigbee v. Pacific Tel. & Tel. Co. (1983) 34 Cal.3d 49, 192 Cal.Rptr. 857, 665 P.2d 947); or
a car parked in front of a fast-food restaurant service window which for some reason lurches forward over a bumper stop *895 (the facts in Barker v. Wah Low (1971) 19 Cal.App.3d 710, 97 Cal.Rptr. 85); or
a confused elderly driver trying to park head-in at a convenience store parking lot who accidentally hits the accelerator instead of the brake (the facts in Jefferson v. Qwik Korner Market, Inc. (1994) 28 Cal.App.4th 990, 34 Cal.Rptr.2d 171, and in which there was no liability).

II
The majority opinion fails to note a number of important facts, and merely alludes to several others without telling the complete story. These facts are uncontradicted:
(1) Abrams had thought about driving into the children on the preschool playground for five years[2] prior to the crime.[3]
(2) Abrams had to make an abrupt right turn and go up over the curb, then accelerate into and over the chain-link fence. He did not lose control of the car.
(3) The playground was protected by a raised curb on the sidewalk which is at least a few inches high, the sidewalk itself, and a four-foot high chain-link fence.
(4) The full story of the so-called runaway mail truck incident, which demonstrates that the incident was a fluke comparable to a meteor strike. The full story goes like this, as described by a neighbor's deposition submitted in opposition to the summary judgment motion: The neighbor was out in front of his duplex across the street. The neighbor saw a mail truck pull up. The mail carrier reached out of his truck to open the adjacent mailbox. (That means that it was obviously one of those mail trucks with the steering wheel on the right hand side so that mail carriers don't have to get out of the driver's seat every time they make a stop.) As the mail carrier reached for the box, he slipped out of his truck, and "did a flip and landed between the mailbox and the truck." The neighbor surmised that when the mail carrier "went down, he pulled the steering wheel, and it justthe truck took off," and headed directly at the fence "across the street." It "bounced up over the curb and went through the fence and came to rest at the tree inside the yard." It was going "[m]aybe five miles an hour" when it went through the fence.
There were no injuries from the incident.
The mail truck incident could only have happened in the context that it dida right-hand side drive vehicle, a driver leaning out the window to deliver mail, and the engine set at an idle sufficiently high that the truck might coast across the street on its own and lumber head-on toward the chain-link fence.
(5) In all the other prior incidents, i.e., where a car might have been traveling parallel to the preschool on Santa Ana Avenue, rather than straight across it and the driver of a car might have accidentally lost control, the curb and sidewalk proved adequate. The same neighbor who saw *896 the mail truck incident, when asked if he was aware of any incidents (other than the mail truck) where a vehicle "encroached" onto the preschool playground, answered: "There's a lot of cars that hit the curb, went up on the curb, but not through the fence, no." (Emphasis added.)
As the majority points out (maj. opn. at p. 888), "there were exactly zero incidents in which the chain link fence stopped a car," but as the majority does not point out, the curb and sidewalk alone had been sufficient to stop any errant traffic. Only where the vehicle was pointed directly at the fenceand lacked a driver who might otherwise have applied the brakes as it bounced up over the curbdid the vehicle penetrate the yard.

III
The majority opinion puts deliberate criminal acts by third parties into the same category as risks of harm attributable to negligent acts by third parties. For example, early on it states: "For purposes of evaluating whether a duty is owed, the issue of `foreseeability' refers to whether the defendants' alleged negligent conduct created a foreseeable risk of a particular kind of harm, not whether the specific conduct of a particular third party wrongdoer could be anticipated." (Maj. op. at p. 885.) No authority is given for this proposition as worded,
The key words are, of course, "foreseeable risk of a particular kind of harm." (Emphasis added.) The words "kind of harm" fail to recognize differences in risk between accidents and criminal acts. The effect is to focus solely on the third party's instrumentality instead of the third party's intent. By doing so, the majority opinion transforms what was impossible to foresee (a criminal assault using a car as a deadly weapon) into something that sometimes is foreseeable (that a driver would lose control of a vehicle and veer off the road). As a result, the majority fails to note the significance of the absolute absence of any prior similar actsindeed, even any prior indicia of potential criminalityin this case.
Our Supreme Court's major recent pronouncements on the duty of landowners to protect against the criminal acts of third parties, Ann M. v. Pacific Plaza Shopping Center (1993) 6 Cal.4th 666, 25 Cal.Rptr.2d 137, 863 P.2d 207 and Sharon P. v. Arman, Ltd. (1999) 21 Cal.4th 1181, 91 Cal.Rptr.2d 35, 989 P.2d 121, are irreconcilable with my colleagues' decision.[4] As a panel of the *897 Court of Appeal recently wrote in Hassoon v. Shamieh, supra, 89 Cal.App.4th 1191, 1196, 107 Cal.Rptr.2d 658: "As we read these controlling precedents [referring to Ann M. and Sharon P.], the requirement of `prior similar incidents' is more than a factual precondition to premises liability; it is the objective event that separates the duty of care imposed by the law on ordinary property owners from the higher duty imposed on that smaller class of owners whose prior experience with physical violence on their premises makes it reasonable for the law to impose upon them a duty to take reasonable security measures, a breach of which resulting in injury is answerable in damages." (Original emphasis; see also Lopez v. Baca (2002) 98 Cal.App.4th 1008, 120 Cal.Rptr.2d 281 [absence of any prior criminal incidents made assault in nightclub inherently unforeseeable]; Romero v. Superior Court (2001) 89 Cal.App.4th 1068, 107 Cal.Rptr.2d 801 [absence of prior assault or of dangerous "propensities" of guest relieved family having teenage friends over of liability for sexual assault]; Kentucky Fried Chicken of Cal, Inc. v. Superior Court (1997) 14 Cal.4th 814, 819, 59 Cal.Rptr.2d 756, 927 P.2d 1260 [duty to protect against criminal acts implies reasonable cause to anticipate such acts]; Rosenbaum v. Security Pacific Corp. (1996) 43 Cal.App.4th 1084, 50 Cal. Rptr.2d 917 [because inadequate lighting played no role in criminal attack on sidewalk, no duty]; Madhani v. Cooper (2003) 106 Cal.App.4th 412, 415-416, 130 Cal. Rptr.2d 778 [fact of "repeated assaults" by one tenant against another made further assault foreseeable; court was "not dealing here with an isolated incident or extraordinary behavior on the part" of the assaulting tenant]; cf. Pamela W. v. Millsom (1994) 25 Cal.App.4th 950, 30 Cal.Rptr.2d 690 [broadening Ann M. to general security measures, not just security guards].) After all, in more general terms, "`"The imposition of vicarious liability is particularly disapproved in cases where a landowner is claimed to be liable for the criminal acts of third parties."'" (Hassoon, supra, 89 Cal.App.4th at p. 1197, 107 Cal. Rptr.2d 658.)
The conflation of intentional acts with negligent ones is repeated several times in the majority opinion and forms its rationale. The critical sentence in the majority opinion, the one where the majority gives a reason for their decision today, is this: "In fact, as plaintiffs attempted to point out, the issue of `foreseeability' does not depend upon the foreseeability of a particular third party's act, but instead focuses on whether the alleged negligent conduct at issue created a foreseeable risk of a particular kind of harm." (Maj. op. at p. 887, original emphasis.) By using that phrase, the majority obliterates a distinction that is etched into the law.
Indeed, the majority's arson example only illustrates the distinction. If a landowner has reason to anticipate arson, the most logical precaution is to hire a security guard, or install a video surveillance systemthe sorts of measures that were at issue in Ann M. and Sharon P. That is rather different than the sort of precautions which might be appropriate in the case of an older house with fragile wiring, where a smoke alarm or clearly exits might do. In the case of foreseeable arson, a multitude of smoke alarms, clear hallways and clearly marked exits may be ineffective. The nature of the harm is the same (fire) but the precautions necessary *898 to protect against that harm are significantly different.
The closest the majority opinion comes to confronting the problem that this is a criminal case, not a traffic case, is a passage on page 889 of the majority opinion where it attempts to distinguish Ann M. based on the idea that the "harm" involved in Ann M., a rape, is "by its nature a crime. There are no negligent rapes." (Original emphasis.)
The attempt to distinguish Ann M. (and impliedly Sharon P. as well) on the theory that those cases involved sexual assaults fails. Sexual assaults are by their nature intentional acts. However, bullets can be fired without intent to do harm. (E.g., State Farm Mut. Auto. Ins. Co. v. Partridge (1973) 10 Cal.3d 94, 98, 109 Cal. Rptr. 811, 514 P.2d 123 [pistol discharged on its own in truck when vehicle hit a bump].) And automobiles can be used as deadly weapons. (E.g., People v. Claborn (1964) 224 Cal.App.2d 38, 41, 36 Cal.Rptr. 132 [defendant aimed his car directly at patrol car of deputy sheriff; just before the collision defendant clenched his teeth and tightened his grip on the steering wheel].) Bullets were the instrumentalities of harm in Lopez v. Baca, supra, 98 Cal.App.4th 1008, 120 Cal.Rptr.2d 281, and Alvarez v. Jacmar Pacific Pizza Corp. (2002) 100 Cal.App.4th 1190, 122 Cal. Rptr.2d 890 (discussed in more detail below), so it obviously makes no difference, from the question of the scope of Ann M. or Sharon P., whether the attack was in the nature of a sexual assault, a stabbing, a shooting, or the use of an automobile as a deadly weapon.

IV
But there is yet another reason I must dissent. Not only was the foreseeability of Abrams' attack so remote that the preschool cannot be reasonably held liable for not protecting against such an attack, but the attack itself, and not any flimsiness of the fence, was the actual legal cause of this terrible tragedy. No breach of any duty on the part of the preschool caused it.
The lack of causation in the context of landowner liability for the criminal acts of third parties has been held dispositive in a number of appellate decisions, including the horrible massacre at a McDonald's restaurant in San Ysidro in the mid-1980's. (See Lopez v. McDonald's Corp. (1987) 193 Cal.App.3d 495, 516-517, 238 Cal.Rptr. 436 [no causal nexus between lack of security measures and actions of a "demented, mentally unbalanced man, bent on murder and self-destruction"]; accord, Nola M. v. University of Southern California (1993) 16 Cal.App.4th 421, 436-437, 20 Cal. Rptr.2d 97 ["where, as here, we are presented with an open area which could be fully protected, if at all, only by a Berlin Wall, we do not believe a landowner is the cause of a physical assault it could not reasonably have prevented"]; Thai v. Stang (1989) 214 Cal.App.3d 1264, 1273, 263 Cal.Rptr. 202 ["Given the random nature of drive-by shootings, which makes them difficult to police against, we do not discern how Stang could have prevented Thai's injuries."].)
In the wake of those decisions, our high court recently confronted the problem of causation in Saelzler v. Advanced Group 400 (2001) 25 Cal.4th 763, 107 Cal.Rptr.2d 617, 23 P.3d 1143. There, a Federal Express delivery person was assaulted at a large apartment complex in an acknowledged high crime area; the complex provided nighttime, but not daytime, security services. The delivery person, however, had no evidence showing that her assault might have been prevented by additional security, particularly in light of the fact that she was unable to prove that the assailants didn't live in the complex. *899 There was only speculation making the link between her injuries and lack of security. (Id. at pp. 774, 776, 107 Cal.Rptr.2d 617, 23 P.3d 1143.)
The suggestion that something "sturdier" than a chain-link fence might have prevented the attack won't stand up under analysis. Recall that when the neighbor whose deposition was submitted in opposition to the summary judgment motion was specifically asked whether any vehicles (other than the mail truck) ever "encroached" on the preschool, his answer was no. Why? Because in every case where a car had lost control and run up into the curb, the curb and sidewalk had been sufficient to stop it.
That, of course, stands to reason. When a driver, who might be lighting a cigarette or fiddling with a cell phone loses control and veers off the side of the road, his or her first instinct will be to stop, not accelerate into a fence head-on. But in Abrams' case he turned into the fence and accelerated. His head-on acceleration directly through the fence with the intent to kill was the true cause of the fence not being able to stop him.
Justice Werdegar, in her dissent in Saelzler, made the point that the case there did not involve a "difficult line-drawing problem." (See Saelzler, supra, 25 Cal.4th at p. 786, 107 Cal.Rptr.2d 617, 23 P.3d 1143 (dis. opn. of Werdegar, J.).) The point was made in rhetorical juxtaposition to the majority's argument that it is hard for a landowner to know exactly how much protection is enough. (See ibid., replying to id. at p. 777, 107 Cal.Rptr.2d 617, 23 P.3d 1143, "wondering `"[h]ow many guards are enough? Ten? Twenty? Two hundred?"'") Her argument was that if a single security guard had been available to escort the Federal Express employee "it is difficult to imagine that the attack on plaintiff would have occurred." (Id, at p. 786, 107 Cal.Rptr.2d 617, 23 P.3d 1143 (dis. opn. of Werdegar, J.).)
In the case before us, however, there is a difficult line-drawing problem which underscores the absence of legal causation. We might ask, as the Saelzler court asked, how much is enough? A chain-link fence with more solid footings? A brick wall (and note that many heavy cars can drive through some brick walls and keep on going)? A reinforced concrete wall? If one were to follow the majority opinion to its logical conclusion, only a concrete bunker would have sufficed, because anything less, i.e., that might be knocked down by a heavy car accelerating into it, would not have prevented Abrams' attack.

V
Precedent relied on by my colleagues fails to support their conclusion. The majority opinion says that "We agree with plaintiffs that Robison v. Six Flags Theme Parks Inc., supra, 64 Cal.App.4th 1294, 75 Cal.Rptr.2d 838, is analogous."
I disagree. Robison arose out of the fact that the designers of an amusement park decided to put a picnic area right in the middle of a large parking lot. Drivers leaving the parking lot would, if they followed the lines, be forced to aim directly at the picnic area before turning left to get into an exit lane at a "T" intersection. (Robison, supra, 64 Cal.App.4th at p. 1296, 75 Cal.Rptr.2d 838.)
The picnic area was covered with grass, but "[n]o curb, change in elevation, tire stop, ditch, foliage, railing, bollard, planter or other barrier" separated the parking lot pavement from the grass. Rather, there was a "level ground" transition from the pavement to the grass. (Robison, supra, 64 Cal.App.4th at p. 1296, 75 Cal.Rptr.2d 838.)
*900 One day, as the court wrote, "[t]he predictable ... happened." (Robison, supra, 64 Cal.App.4th at p. 1297, 75 Cal.Rptr.2d 838.) A car wouldn't start, and, because of its manual transmission, had to be push-started. The owner, a 21-year-old man, put his friend, a 41-year-old developmentally disabled woman who had never driven a car and didn't know how to drive one, behind the steering wheel while he pushed. The motor started and the car began to accelerate, but the woman panicked. The man ran behind shouting instructions, but to no effect. The car eventually reached 25-to-40 miles an hour. It traveled directly over the stop sign painted on the pavement, went over about 40 feet of grass, and hit a picnic table, injuring the plaintiffs. (See id. at p. 1298, 75 Cal.Rptr.2d 838.)
The Robison court rejected the amusement park's lack-of-foreseeability argument based on the highly unusual facts which caused a car whose driver had no control over it to head toward the picnic area in the first place. It noted that, given the "configuration and use of the parking lot and picnic area" it was readily foreseeable that "a car might fail to turn left at the word `stop' painted on the pavement, and that picnickers might be injured as a consequence of Magic Mountain's failure to provide an appropriate separation between the parking lot and the picnic area." (Robison, supra, 64 Cal.App.4th at p. 1299, 75 Cal.Rptr.2d 838.)
For the Robison court, the design of the picnic area and parking lot was an accident waiting to happen. "Here, for example," the court wrote, "it was open to simple observation that Magic Mountain had aimed a heavily traveled parking lane (with a speed limit of 25 miles per hour) directly at the picnic table with no separation other than W feet of flat grass, and that a car traveling at a speed no higher than Magic Mountain's own speed limit would cover this distance in less than 2 seconds, too short a time to allow for reliable evasive action by an unsuspecting person seated at a picnic table, possibly with his or her back to the oncoming car." (Robison, supra, 64 Cal.App.4th at p. 1301, 75 Cal.Rptr.2d 838, emphasis added.)
Moreover, in distinguishing Ann M., the Robison court specifically contrasted criminal acts from negligent configuration. "Crime can happen anywhere, but cars cannot crash into picnic tables just anywhere." (Robison, supra, 64 Cal.App.4th at p. 1301, 75 Cal.Rptr.2d 838.)
Robison is obviously a different genus than the present case, particularly given the Robison court's own contrast between the criminality present in Ann M. and the negligent design before it. If this case had involved a "T" intersection with no barrier at all between cars which would, under normal traffic patterns, be directed head-on at the preschool, then maybe Robison might be partially analogous (and only then if we were to ignore the distinction between criminal acts and accidents, and the lack of causation discussed above).
My colleagues' interpretation of Robison may be the result of a problem that all judges must deal with, which is the sheer effort and extra words that are often needed to express a thought precisely. In Robison, for example, the court referred throughout its opinion to vehicles traveling by themselves in a way that anthropomorphized the vehicle. Hence the opinion uses phrases such as "an out-of-control car," a "runaway car," "a car might fail to turn left," and "the generic runaway car" (albeit there quoting the trial court). Literally, several parts of the Robison opinion read as if cars were autonomous things, reminiscent of Stephen King's novel Christine, a story about a demon-possessed car.
*901 That usage was obviously shorthand. The Robison opinion is a good illustration why appellate opinions must be read in context. For the Robison court, it was clearly too cumbersome to write, every time a reference was desired, something like, "a car whose driver had lost control," though the latter would have been more accurate. My point is that one cannot extract from Robison some generic risk from Christine-like "runaway cars" or "errant traffic." Risks come in different sorts.
The Robison case was about a risk that was actually created by the design of the Magic Mountain parking lot, in which traffic was directed to flow at pedestrians sitting in a totally unprotected picnic area, so that there was no barrier at all if the driver of a car exiting the parking lot either failed to turn or lost control and kept going in a straight line. Indeed, the case did not even go so far as to say that Magic Mountain should have provided an impenetrable wall between the parking lot and the picnic area. The negligence was in the very design of the parking lot, with its requirement that vehicles headed straight for the picnic area make a turn immediately prior to reaching the area. The Robison case was not about the risk of pedestrians being hit by cars in all contexts. I need only note that the various forms of risk from "runaway" cars are diverse, and each case must be analyzed on its own facts. There is a difference in risk between a car parked up a hill if its brakes fail, and a speeding drunk driver who loses control on a busy street. Those are risks inherent in geography and street layout. This is not a case where the children were allowed to play in the middle of the street, or where there was no protection against children dashing into the street. By contrast, in the case before us, where the children were in an enclosed playground, the risk involved deliberate criminal conduct by a driver who intentionally turned into a fenced preschool protected by a curb, sidewalk and chain-link fence, which is nothing like the risk in Robison. Or Bigbee or Barker or Jefferson either.
And here is yet another case irreconcilable with today's decision, Alvarez v. Jacmar Pacific Pizza Corp., supra, 100 Cal. App.4th 1190, 122 Cal.Rptr.2d 890. In Alvarez, a group of friends were eating in a pizza parlor. Three drunks with a video-camera came up to the women in the party and made obscene remarks. That led to a fistfight in the parking lot, where the victim ultimately hit his eventual killer in the face, with the killer saying, "We'll see you later." A restaurant employee made a call to the police. The police came, and later left having been told by the employee that the fight was over. However, about a half an hour later the killer came back, approached the victim in his group, and shot him. (See id, at pp. 1209-1210, 122 Cal. Rptr.2d 890.)
Interestingly enough, there had been three violent incidents at the pizza parlor in the two and one half years prior to the murder. But the Alvarez court looked to both Ann M. and Sharon P., and noted that the prior incidents weren't similar. "None of these incidents," wrote the Alvarez court, "involved the operative facts to this case: a verbal and physical confrontation between two groups of customers; a simple statement by one group, unaccompanied by any threat of violence, that it would be back; and the return of that group with a weapon and an execution-style murder." (Alvarez, supra, 100 Cal. App.4th at p. 1212, 122 Cal.Rptr.2d 890.)
Now for the moment, let me segue back to Robison. My colleagues believe that Robison stands for the proposition that it makes no difference why a car loses control, the only thing the court need concern *902 itself with is that it did. But that reading of Robison is inconsistent with Alvarez. If, in Alvarez, prior but not similar criminal acts were not enough to show foreseeability, how can one conclude that there is foreseeability in a case where there were no criminal acts, and even the non-criminal acts (some cars that apparently ran up the curb and were stopped before they reached the fence and a flukish runaway mail truck) did not involve the "operative facts" of this case?
Even the dissent in Alvarez fails to support the position of my colleagues here. Just as Justice Werdegar argued in Sharon P. that the majority had fashioned too absolute a rule, so did Justice Epstein in Alvarez. He argued that it was enough that it was foreseeable that the killer would return "bent on a violent assault" even though it may not have been foreseeable that he would have returned with a weapon intent on murder. (See Alvarez, supra, 100 Cal.App.4th at p. 1221, 122 Cal.Rptr.2d 890 (dis. opn. of Epstein, J.).) However, Justice Epstein distinguished Ann M. and Sharon P. on the ground that in each of those cases, "the court was concerned with the foreseeability of criminal conduct by an unknown and unknowable possible assailant." (Alvarez, supra, 100 Cal.App.4th at p. 1220, 122 Cal.Rptr.2d 890 (dis. opn. of Epstein, J.).) For Justice Epstein, the case before him was different because the "identity of the assailant ... was precisely known." (Ibid., emphasis added.)
Here, even under Justice Epstein's test, i.e., criminal conduct by an "unknown and unknowable possible assailant," the majority's position lacks support. We have no indication that Abrams was known at all to the preschool prior to this tragedy.

VI
Finally, I need only add that, as this court pointed out in Jefferson v. Qwik Korner Market, Inc., supra, 28 Cal.App.4th 990, 34 Cal.Rptr.2d 171a true "errant traffic" casethat the present case fits none of the established bases for liability even for negligent third party driving.
In Jefferson, a minor was standing on the sidewalk in front of a convenience store. An 84-year-old driver was pulling into a parking space in front of him. Suddenly the driver's foot slipped, and the car jumped both the parking blocks and the curb of the sidewalk, hitting the minor. In rejecting the idea that the convenience store had a duty to protect against that particular risk, we noted that liability of landowners to pedestrians hit by negligent third party drivers has only been predicated on one of three scenarios: (1) "no protection whatever from encroaching vehicles" (see Jefferson, supra, 28 Cal.App.4th at p. 994, 34 Cal.Rptr.2d 171); (2) "knowledge of prior similar incidents" (ibid.); and (3) a configuration in which the plaintiff will be in a specific fixed location which is especially vulnerable to any cars whose drivers might lose control (id. at p. 995, 34 Cal.Rptr.2d 171).
Clearly, in the case before us, Abrams' intentional use of his automobile as a deadly weapon does not fit any of the accepted bases for liability on an errant traffic theory. There was a chain-link fence, a sidewalk, and a curb. Indeed, the neighbor's deposition in which he noted that "There's a lot of cars that hit the curb, went up on the curb, but not through the fence," indicates that, in terms of the usual risk of speeding traffic on Santa Ana Avenue, the existing fence was sufficient.
Nor can the "errant" mail truck be considered a prior similar incident. The incident was a total fluke. First, the mail truck was on the other side of the street. Unlike 99.9 percent of vehicles on the road *903 in this country, it had a right-hand side steering wheel, thus making it easier for a mail carrier to deliver mail without getting out of it. Unlike 99.99 percent of all vehicles on the road, not only did it have a right hand steering wheel, but an open door for a driver to fall out of it. The incident stemmed directly from those particularities. Pointed as it was directly at the fence, its sheer bulk allowed it to plow through the fence at a speed that is less than most people jog.
That "incident" was hugely different from Abrams' murderous assault, which had nothing to do with accidental loss of control of a vehicle (unlike Bigbee, Barker, Jefferson, and the mail truck). Recall that Abrams went by the preschool first and then circled back. Then he made an "abrupt right hand turn" into the fence. He "`accelerated into the kids.'" He aimed his car right at the children. Abrams had been thinking of the incident for five years. He selected his victims for their very innocence. Indeed, the injuries and deaths in this case stem from the fact that Abrams' car was not "out of control." It was very much in the control of a driver bent on using it to kill innocents.

VII
I share my colleagues' heartfelt sympathy for the plaintiffs. But, unfortunately, I cannot agree with their analysis and conclusion. California courts have traditionally followed the Palsgraf approach where duty is defined by risk, not generic "kind of harm." (E.g., Wawanesa Mutual Ins. Co. v. Matlock (1997) 60 Cal.App.4th 583, 585, 70 Cal.Rptr.2d 512 [following Palsgraf because the "`"combination of events and circumstances"'" necessary for the injury was "`"too improbable"'"].) Now, after seventy-five years, my colleagues bid Palsgraf adieu.
It is an unfortunate farewell. If today's decision were the rule, insurers would require every tot-lot to be turned into a concrete bunker. That should not happen.
I would affirm the judgment.
NOTES
[1] Plaintiffs also sued Abrams, but he is not involved in this appeal.
[2] In its reply, defendant Southcoast states the mail truck incident happened in 1996, before Southcoast actually took over the daycare premises. It asserts "there is no evidence that Southcoast had notice of the postal truck incident...." However, it is Southcoast, as the moving party, which has the burden of demonstrating, as an undisputed fact, that it had no notice the playground was vulnerable to wayward traffic.
[3] Our dissenting colleague takes us to task for failing to point out that the children were "protected" by a raised curb and a sidewalk. He is correct that there is a raised curb and a sidewalk between the street and the playground; we believe he is incorrect in suggesting that such "obstacles" provide "protection" from the 3,000-pound, steel platforms on wheels which passed the preschool daily. This is especially true where, as here, a prior unmanned vehicle had coasted over the curb, across the sidewalk and through the fence at five miles an hour. A juryor a reasonable person running a preschoolmight consider that a pretty good indicator the playground should be moved or better protected.

We note our colleague asserts that "In all the other prior incidents, i.e., where a car might have been traveling on Santa Ana Avenue rather than straight across it and the driver of a car might have accidentally lost control, the chain link fence proved adequate." Since his italics might suggest otherwise, we feel constrained to point out that there were exactly zero incidents in which the chain link fence stopped a car. The only car to hit it was the coasting mail truck which flattened it at five miles an hour.
[4] The dissent argues that "only a concrete bunker would have sufficed" to protect these children. That, of course, is a matter of fact, properly left to a jury. The option of simply moving the children to another part of the preschool is nowhere discussed in the dissent.
[5] The dissent relies heavily upon the fact the driver in this case "had thought about driving into the children on the preschool playground for `five years.'" We cannot find this in the record. Abrams had contemplated a crime against what he called "the innocents" for years. He originally meant anyone not responsible in any way for his problems, but eventually narrowed the concept to children. Yet we find nothing indicating he had these particular innocents in mind prior to a year before the crime. While Abrams made many statements about thismost of them conflicting to some degree or anotherincluding the rather ambiguous one relied upon by our dissenting colleaguethey seem to us only to enrich the factual dispute which should be submitted to a jury.

Even if Abrams had long contemplated killing the children at this preschool, however, our colleague's argument proves too much. Abrams admitted being enraged by a conflict with another driver earlier that day. Then, he drove past the schoolyard, saw the children and doubled back. This sounds like the classic "target of opportunity." A good argument could be made to a jury hearing this case that had there been better barriers, or had the children been playing somewhere not accessible from the street, Abrams would have had no reason to double back and his crime might well have remained entirely in his headas it had for so long. Further, and perhaps more important, if the children had been better protectedor moved to another part of the preschoolit might never have occurred to Abrams to focus on these particular innocents at all.
[6] Of course, while it would have been equally tragic from a societal standpoint if Abrams were simply deflected into killing some other children by that different method, the distinction is everything to these plaintiffs.
[1] Fascinatingly, as the court in Hassoon v. Shamieh (2001) 89 Cal.App.4th 1191, 1196, footnote 2, 107 Cal.Rptr.2d 658, recently observed, even Justice Cardozo's formulation may be too liberal in the context of the foreseeability of third party criminal conduct. As the Hassoon court noted: "For policy reasons identified by the court in Ann M., supra, 6 Cal.4th 666," 25 Cal.Rptr.2d 137, 863 P.2d 207 and, Sharon P., supra, 21 Cal.4th 1181, 91 Cal.Rptr.2d 35, 989 P.2d 121, the third party premises liability cases refute" the proposition that "duty and foreseeability are coextensive." For the Hassoon court, "Because one might foresee the possibility of a violent criminal act `anywhere,' duty (and tort liability) requires more than mere foreseeability; it requires a `heightened foreseeability' embedded in the `prior similars' rule."
[2] The details are in a police report found at page 198 of the Appellant's Appendix (part of the papers supporting the owner's summary judgment motion). Here is the quote from the officer: "I walked up to Abrams and asked him if he could tell me what he told the paramedics. Abrams said, `I have been thinking about this for five years.' I said, "What for five years?' Abrams replied, `I purposely drove onto the property and hit the kids.'"
[3] The tact is placed in a footnote on page 14 of the majority opinion, in the context of suggesting that Abrams' act might have been a spur-of-the-moment type of thing. But even if it were spontaneous (and the fact that Abrams circled back to the preschool and his statements to the police immediately afterwards belie such a view), that would make no difference. There is no doubt that when he acted, he acted deliberately.
[4] I recognize that there may be some play on the degree to which the absence of prior similar acts is wholly dispositive as regards any duty to protect against all third party criminal acts. Justice Werdegar, for example, dissented in Sharon P. "insofar as the majority opinion may be read impliedly to reinstitute a pure prior similar incidents rule," taking the position that there could be cases where the absence of prior foreseeable acts might not be wholly dispositive. (Sharon P., supra, 21 Cal.4th at p. 1201, 91 Cal. Rptr.2d 35, 989 P.2d 121 (cone. & dis. opn. of Werdegar, J.).) However, whatever duty there may be on the part of landowners to protect against the criminal acts of third parties without prior similar acts, there is still a need for at least some indicia of criminality to make the attack foreseeable enough such that the law would impose a duty of care to protect against it. (See id. at p. 1202, 91
Cal.Rptr.2d 35, 989 P.2d 121.) In that regard, consider Trujillo v. G.A. Enterprises (1995) 36 Cal.App.4th 1105, 43 Cal.Rptr.2d 36. There, the court held there could be liability for criminal acts in situations where an establishment holds itself out as providing security, but a security guard does nothing even though an assault takes place before his very eyestalk about indicia of criminality at a time when you can prevent it! (To the same effect is Mata v. Mata (2003) 105 Cal.App.4th 1121, 1129-1130, 130 Cal.Rptr.2d 141, holding there were triable issues of fact as to whether a security guard acted reasonably in, for example, not checking an assaultive customer for weapons or in not removing that customer from a parking area from which he fired the fatal shot.) In the case before us, however, there is no prior indicia of criminality in the record, not just no prior similar acts.